UNIVERSAL FOUNDRY COMPANY, Plaintiff-Respondent, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, Defendant-Appellant: CLARK, Defendant.

Supreme Court

*No. 76–314. Submitted on briefs November 29, 1978.— Decided January 9, 1979.*
(Also reported in 273 N.W.2d 324.)

For the appellant Department of Industry, Labor and Human Relations Job Service Division, the cause was submitted on the brief of *Uclair W. Brandt,* chief counsel, *David A. Pearson,* assistant chief counsel, and *James L. Pflasterer,* attorney.

For the respondent the cause was submitted on the brief of *George D. Cunningham, Barbara J. Fick* and *Foley & Lardner* of Milwaukee.

WILLIAM G. CALLOW, J.    This is an unemployment compensation case.  The question presented is whether the record would support the Industry, Labor and Human Relations Commission's conclusion that the employee's suspension for union activities was not a disciplinary suspension for misconduct and, therefore, the employee was eligible for unemployment benefits.

George Clark worked as a machine operator for Universal Foundry Company in Oshkosh for nine years.  For six years he was president of Local No. 345 of the Inter-

national UAW. This bargaining unit consisted of about 340 Universal Foundry employees.

At a regularly scheduled grievance meeting on Tuesday, February 11, 1976, the company presented to union officials its plan to institute a four-day work week to begin immediately. Thirty-one maintenance employees and three machine operators, one for each shift, were the only employees scheduled to work on Friday. The three machine operators scheduled to work were top union officers. Clark, by virtue of his seniority, could have worked on Friday but was specifically excused. The union's response to the plan was that a four-day work week should apply to all union employees. Richard Cavanaugh, the Universal Foundry works manager, testified that Clark said at the February 11 meeting that he would "throw up a picket line Friday and keep them [employees called to work] out" and he would "deny access to the plant." At a hearing before an Industry, Labor and Human Relations Department examiner acting as an appeal tribunal,[1] Clark denied saying that he would keep workers out. He testified that he said he would be out to pass on information to the union members concerning the dispute and to ask them to attend a Saturday meeting. He said that he rarely saw the second and third shift workers. Clifford Shew, an employee on the grievance and bargaining committee, testified that at the February 11 meeting Clark said there would be "people out there" on Friday and "that the four-day work week meant that everyone was on a four-day work week." Shew did not recall Clark saying that he would stop people from going to work. Cavanaugh said that Clark then "was reminded of his responsibilities as president of the local." The collective bargaining agreement contained a no-strike, no-lockout provision and a requirement that, in the event of an unauthorized strike, union

---

[1] *See:* Sec. 108.09 (4), Stats.

officials use their best efforts to settle the strike and notify striking workers to return to work.

On February 12, a meeting was held at the union's request. Ralph Amerling, a representative of the International UAW, was present. Clark testified that Amerling told the union they "could not in any way keep people out of that plant" but that they could have an informational line. The company and the union remained firm in their positions on the four-day work week issue. The company reminded the union officials of their responsibility to "make sure that there weren't any problems." The union representatives responded that they were aware of their responsibilities under the collective bargaining agreement. Clark testified that, at the close of the February 12 meeting, Amerling said the union would set up an informational picket line. Cavanaugh testified that he recalled Amerling saying that there would be a picket line, but he did not recall him saying it would be informational.

On Friday, February 14, Clark and a fellow employee, Halsey, arrived at the foundry at 4:05 a.m. The first shift normally began at 5 a.m. They put up three signs near the plant entrance. One said, "UNFAIR LABOR PRACTICES CLAIMED BY MEMBERS OF LOCAL 345 UAW. GEORGE CLARK, PRESIDENT." Another said, "THIS IS A TEST. ARE WE A UNION OR ARE WE NOT? WHO IS PRESIDENT OF YOUR UNION: GEORGE CLARK OR JOE KERKMAN?" (Kerkman was the company's vice president of industrial relations.) The third sign read: "4 DAYS A WEEK MEANS 4 DAYS FOR ALL MEMBERS OF LOCAL 345. THIS IS AN INFORMATIONAL PICKET LINE. CROSS AT YOUR OWN RISK. GEORGE CLARK, PRESIDENT." There were between five and seven people on the picket line Friday morning. Cavanaugh testified that several employees reporting for work who talked to Clark did

not go to work, but he only identified three. Two joined Clark and Halsey on the picket line, and Clark admitted he did not tell either of them that they belonged in the plant or were to report to work. The parties stipulated that of the thirty-one maintenance employees scheduled to work on February 14 eight did not report. None of the three scheduled machine operator production workers appeared. One of them was in the hospital following an auto accident. The company made no effort to determine the cause of the absences. Clark said that he talked to less than a half-dozen employees and that he never asked anyone not to go to work.

The Friday morning picketing lasted about two hours. Clark returned at about 12:30 p.m. and picketed for another hour, with about six or seven employees. Two trucks stopped at the picket lines. When their drivers asked if the workers were on strike, Clark told them that they were not. Both trucks proceeded into the company yard.

One employee left the plant in a pickup truck, making a derogatory comment and gesture toward Clark as he turned onto the street. The truck stopped about a half block away. Clark approached the truck, and during the ensuing scuffle Clark reached into the truck and slapped the driver several times. Clark testified that there were no injuries and no hard feelings.

The following week, after three meetings between the company and the union, the company terminated the employment of Clark and Halsey and suspended eleven other employees without pay for their involvement in an unauthorized strike in violation of the collective bargaining agreement. The company also included Clark's striking an employee and failure to urge employees to return to work as grounds for termination of his employment. After further negotiations the union and the company entered into a written settlement of grievance which re-

instated Clark and Halsey but suspended Clark for ninety days and Halsey for sixty days, both without pay.

Clark applied for unemployment benefits. Universal Foundry contested the claim on the ground that Clark's settlement of grievance disciplinary suspension was for misconduct connected with his employment, rendering him ineligible for benefits under sec. 108.04(6)(a), Stats., as a matter of law.[2] An Industry, Labor and Human Relations Department deputy agreed with the company's position and issued an initial determination denying benefits. Clark requested a hearing. A hearing was held on May 21, 1975, before a Department examiner, acting as an appeal tribunal. On June 2, 1975, the examiner decided that the suspension was not for misconduct and allowed benefits. The company petitioned the Commission for review. On December 2, 1975, the Commission affirmed, determining that the evidence supported the appeal tribunal's findings of fact. The company began this action for judicial review in the Circuit Court for Dane County. On June 14, 1976, the court issued a memorandum decision reversing the Department's decision. The same day judgment was entered from which the Department appeals.

There are two issues on appeal: (1) Is the Commission's finding that Clark's picketing activities were confined to informing union members of the dispute and of an upcoming meeting supported by credible evidence? (2) Did Clark's picketing activities and his failure to advise workers that they should report for work constitute

[2] Sec. 108.04(6), Stats., provides in part:

"(6) DISCIPLINARY SUSPENSION. As to an employe's weeks of unemployment by reason of a disciplinary suspension by a given employer, the employe shall be ineligible for benefits as follows:

"(a) If the suspension was for misconduct connected with his employment, he shall be ineligible from the given employer's account for each such week and ineligible from other previous employer accounts for the first 3 such weeks."

misconduct connected with employment under sec. 108.-04(6)(a), Stats., so as to render Clark ineligible for unemployment benefits?

The Commission affirmed the appeal tribunal's finding that:

"As reason for the suspension the employer alleged that the employe, as president of the local union, was a leader in an unauthorized strike on February 14, 1975 (week 7) in violation of the collective bargaining agreement in force between the employer and the union of which he was president. However, his picketing activities were confined to informing union members on the various shifts that there was a dispute between the union and company, and that there would be a meeting of union members to discuss the dispute. He did not attempt to prevent egress from or ingress to the plant. He could reasonably have assumed that such picketing activities were not in violation of the no-strike provision of the agreement. His actions were not undertaken for the purpose of damaging the employer's interests."

The Commission's findings of fact will not be disturbed on judicial review if supported by credible evidence on the record as a whole. *R. T. Madden, Inc. v. ILHR Dept.*, 43 Wis.2d 528, 547–48, 169 N.W.2d 73 (1969).[3] Another

---

[3] Sec. 108.09(7)(b), Stats., provides in part:

"(7) JUDICIAL REVIEW. . . .

"(b) Any judicial review under this chapter shall be confined to questions of law, and the provisions of ch. 102, 1971 Stats., with respect to judicial review of orders and awards shall likewise apply to any decision of the commission reviewed under this section."

Sec. 102.23(1)(d), Stats., provides in part:

"Judicial review. (1) The findings of fact made by the commission acting within its powers shall, in the absence of fraud, be conclusive. . . ."

"(d) Upon such hearing, the court may confirm or set aside such order or award; and any judgment which may theretofore

formulation of this test is that, if only one reasonable inference can be drawn from the evidence, the drawing of the inference is a question of law, and a reviewing court is not bound by the Department's determination. If, however, the evidence allows more than a single reasonable inference, a question of fact is presented, and the Commission's findings, if supported by any credible evidence, are conclusive upon the court. *Vocational Tech. & Adult Ed. Dist. 13 v. ILHR Dept.*, 76 Wis.2d 230, 239–40, 251 N.W.2d 41 (1977); *Kessler v. Industrial Commission*, 27 Wis.2d 398, 400, 134 N.W.2d 412 (1965).

Pertinent provisions of the contract between the parties provide:

"ARTICLE III—GRIEVANCE PROCEDURE

"Section 1. During the life of this agreement should any dispute arise as to the meaning, interpretation, or application of the provisions of this agreement, or as to the performance by either party of obligations imposed by this agreement, there shall be no stoppages of work or strikes on the part of the Union, nor shall there be any lockout or discrimination against the Union on the part of the Company, but instead the Company and the Union will settle such dispute in the manner provided in this Article.

" . . .

"Section 3. In consideration of the continuance in the contract of a no-strike, no-lockout clause and final arbitration of all grievances arising under this contract, the Company agrees that in the event of an unauthorized strike, during the life of this contract, it will waive its right to sue the Union, its officers or members, or the International, for damages resulting from such unautho-

---

have been rendered thereon; but the same shall be set aside only upon the following grounds:

"1. That the commission acted without or in excess of its powers.

"2. That the order or award was procured by fraud.

"3. That the findings of fact by the commission do not support the order or award."

rized strike. In the event of an unauthorized strike, the officers of Local No. 345, U.A.W., agree to use their best efforts to settle the same immediately and will post notices on the bulletin boards or will give other form of notice to the employees that the strike is unauthorized, and that they and each of them should return to work within twenty-four (24) hours from the date the notice is given."

### "ARTICLE XVII—DISCHARGE

"The Company agrees not to discharge or discipline any of its employees except for just cause, and further agrees to give prior notice of such discharge or discipline in writing, and the reason therefor to the Chairman of the Grievance Committee and employee involved. Twenty-four (24) hours shall be considered a reasonable time for such notice, except where there may be immediate and summary suspension pending a final decision on discharge for drunkenness, insubordination, going out or participating in an unauthorized walkout or strike, and other willful misconduct on the part of the employee. In such cases no prior notice of intention to suspend is required, but the Company will, upon such suspension, immediately notify the Steward of the suspended employee and a member of the Grievance Committee prior to the final decision on discharge. A notice, in writing, will also be given to the Chairman of the Grievance Committee. Discharges or discipline occurring under this section for any of the reasons stated herein shall be subject to the grievance procedure as outlined in Article III of this contract."

The company argues, and the circuit court found, that there was no credible evidence to support the finding that the picketing was informational. The circuit court found that the phrase on one sign, "CROSS AT YOUR OWN RISK," conclusively showed that the picket was intended to stop workers from entering the plant by threatening union sanctions for crossing the picket line. The circuit court also found there was nothing on the signs concerning any future meeting to support the Commission's finding that Clark intended to inform the membership that the dispute would be discussed at a meeting.

We are called upon to determine whether a reasonable person under the factual situation presented would have considered Clark's conduct to be a willful interference with the company's interests. The impact of the messages on the signs and Clark's failure to speak to the subject of the obligation of employees to go to work are the critical factors upon which this decision rests. One of the signs read, "4 DAYS A WEEK MEANS 4 DAYS FOR ALL MEMBERS OF LOCAL 345. THIS IS AN INFORMATIONAL PICKET LINE. CROSS AT YOUR OWN RISK. GEORGE CLARK, PRESIDENT." Clark displayed the sign at a time when the people going to work had already worked four days, and therefore this was a direction by the union president not to start the fifth day of work. Another sign reading, "THIS IS A TEST. ARE WE A UNION OR ARE WE NOT? WHO IS PRESIDENT OF YOUR UNION: GEORGE CLARK OR JOE KERKMAN?," called upon the union employee to repudiate the company direction that some persons work five days and accept Clark's direction to work only four days. Clark's testimony about the "CROSS AT YOUR OWN RISK" wording on the sign is as follows:

"*Q.* Now, Mr. Clark, you made up the sign, you composed the contents of it, what does this last sentence mean? What does it mean, cross at your own risk?
"*A.* That was at a risk of deep misunderstanding of what the officers of their union were being asked to do. In other words, the three men that you scheduled to work on production, I'm not talking maintenance, were top officers in this local union. The risk here is of the membership getting the idea that I sucked ass to get one of those machines on this certain day and the same with the other officers."

Applying the objective test of what a reasonable person would have intended and what conclusion a reasonable person would have drawn from the language of the signs, we must conclude that the messages were intended to in-

timidate workers and were informational in that they conveyed the message that adverse union action would be taken against those who entered.

The company argues that Clark is, as a matter of law, precluded from collecting unemployment benefits because his picketing activities constituted misconduct connected with his employment. *See:* Sec. 108.04(6), Stats. This court has defined the term "misconduct," within the meaning of Chapter 108, Stats., in *Boynton Cab Company v. Neubeck,* 237 Wis. 249, 296 N.W. 636 (1941), and reiterated the principles in *Gregory v. Anderson,* 14 Wis.2d 130, 135–36, 109 N.W.2d 675 (1961), and *Cheese v. Industrial Commission,* 21 Wis.2d 8, 16, 123 N.W.2d 553 (1963), as follows:

"conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer." 237 Wis. at 259–60.

In *Milwaukee Transformer Co. v. Industrial Commission,* 22 Wis.2d 502, 511–12, 126 N.W.2d 6 (1964), the court said: "When determining whether a worker's conduct is 'misconduct' which will disqualify him from the benefits of the program, the employee's behavior must be considered as an intentional and unreasonable interference with the employer's interest." This was cited with approval in *Baez v. ILHR Dept.,* 40 Wis.2d 581, 589, 162 N.W.2d 576 (1968).

The circuit court correctly concluded that the only reasonable inference to be drawn from the evidence was

that Clark's conduct in preparing the signs and placing the picket line near the plant was a violation of Sections 1 and 3 of Article III of the collective bargaining agreement and constituted a willful interference with the company's interests and, therefore, was misconduct within the meaning of sec. 108.04(6), Stats. *Streeter v. Industrial Commission,* 269 Wis. 412, 416, 69 N.W.2d 583 (1955).

*By the Court.*—Judgment affirmed.