EASTEX PACKAGING COMPANY, Respondent, v. DEPART-
MENT OF INDUSTRY, LABOR & HUMAN RELATIONS,
and another, Appellants.

Supreme Court

*No. 76–730. Submitted on briefs May 2, 1979.—*
*Decided May 30, 1979.*
(Also reported in 279 N.W.2d 248.)

For the Department of Industry, Labor and Human Relations the cause was submitted on the brief of *Uclair W. Brandt,* chief counsel, and *Barry M. Levenson,* attorney, Job Service Division.

For the respondent the cause was submitted on the brief of *John Walsh* and *Axley, Brynelson, Herrick & Gehl* of Madison.

## PER CURIAM

The Department of Industry, Labor and Human Relations and the claimant, George R. Waters, appeal from a judgment which reversed a decision of the Department. The Department had determined that Waters had not been discharged from his employment with the respondent, Eastex Packaging Company, for misconduct within the meaning of sec. 108.04(5), Stats., and was thus eligible for unemployment compensation benefits.

After an initial investigation, a deputy of the Department issued a determination holding that the employee was discharged for misconduct connected with his employment and consequently was ineligible for benefits. Waters appealed and a hearing was held before an appeal tribunal which subsequently reversed the deputy's initial determination and allowed benefits. The employer petitioned the Industry, Labor and Human Relations Com-

mission for review of the appeal tribunal's decision. The Commission thereafter issued its decision wherein it adopted the findings of fact made by the appeal tribunal and affirmed that decision. Findings of facts made by the appeal tribunal and adopted by the Commission include the following:

"The employee worked in various capacities for the employer, a processor of packaging materials, during about 16 months. His late day of work was October 3, 1975 (week 40). On that day, the employee worked as a 'stock-hustler.' After two weeks during which he was suspended for disciplinary reasons, he was discharged as of October 17, 1975 (week 42).

"The employer asserted as the reasons for discharge that while the employee was oiling a machine, after having been told not to do so by his foreman, the oil can he was using fell into the machine and did considerable damage.

"On October 2, 1975 (week 40), the employee had been told by his foreman not to 'oil the machines', after he had suggested to the foreman that he oil the compressor motor which formed a part of one of two presses to which he was assigned. He had never oiled the compressor motor, but had oiled a different part of that press. Prior to October 2nd, he had never been told by a supervisor either to oil, or not to oil, the press or any part of the press.

"Where an employee's action, in disregard of explicit instructions, causes considerable loss to an employer, that action may constitute misconduct within the meaning of the unemployment compensation act . . . In this case, however, the foreman's instructions were not explicit as to the parts of the press which the employee began to oil. The word 'machines' was ambiguous. Moreover, the employee did not deliberately disregard instructions. He oiled a part of the press which he had previously oiled. Gross or extreme carelessness amounts to misconduct . . . However, a single mistake, even by a worker chargeable with a high degree of care will not constitute misconduct 'in the absence of facts or circumstances indicating a disregard of the employer's interests . . .'

"This was an isolated instance of carelessness, the employee's conduct did not evince any willful, intentional and substantial disregard of his employer's interest.

"The appeal tribunal therefore finds that in week 42 of 1975, the employee was discharged, but not for misconduct connected with his employment within the meaning of sec. 108.04 (5) of the statutes."

After affirmance by the Commission, the employer sought further review in the Dane county circuit court. On review, the court reversed the finding of eligibility concluding that based on the testimony presented, there was only one reasonable inference which could be drawn from the evidence presented to the Commission; that the drawing of that inference was therefore a question of law by the Commission. According to the circuit court, the only reasonable inference from the testimony was that the word "machines" was not ambiguous. The circuit court reasoned that there could only be a finding of ambiguity in the instruction "not to oil the machines" if there was also a finding that the employee had at some time during his employment been instructed to oil the machine or perform a similar task. Because the testimony revealed no such conflicting instruction, the court concluded that a finding of ambiguity based on the word "machines" was against all of the credible evidence presented in the case. Accordingly, the circuit court reversed.

The employee and the Department now appeal to this court, raising the following issue:

"Are the findings of fact made by the Industry, Labor and Human Relations Commission supported by credible evidence and reasonable inferences therefrom so as to be conclusive?"

The scope of review of findings of fact made by the Industry, Labor and Human Relations Commission in

unemployment compensation matters is defined by statute as follows:

"The findings of facts made by the Commission acting within its power shall, in the absence of fraud, be conclusive." Sec. 102.23 (1), Stats., incorporated by reference into sec. 108.09 (7), Stats.

The test used by the court in reviewing the sufficiency of the evidence to support the findings is whether there is any credible evidence in the record sufficient to support the finding made by the Commission. *R. T. Madden, Inc. v. DILHR*, 43 Wis.2d 528, 548, 169 N.W.2d 73 (1969). As this court recently noted in *E. F. Brewer Company v. DILHR*, 82 Wis.2d 634, 264 N.W.2d 222 (1978), under this test, a court upon review will affirm the findings of DILHR if there is any credible evidence to sustain those findings. The fact that the evidence is in conflict is not a sufficient basis for the reversal of the findings of the Department. Even if the findings of the Department are contrary to the great weight and clear preponderance of the evidence, reversal is not commanded because it is not the function of the reviewing court to determine whether the findings that were not made should have been made or could have been sustained by the evidence. Rather, the inquiry is to whether there is any credible evidence to sustain the findings that were in fact made. *See Unruh v. Industrial Commission*, 8 Wis.2d 394, 99 N.W.2d 182 (1959), and *Briggs & Stratton Corp. v. ILHR Department*, 43 Wis.2d 398, 409, 168 N.W.2d 817 (1969). It is the function of the Department, and not the reviewing court, to determine the credibility of evidence or witnesses and it is for the Department to weigh the evidence and decide what should be believed. *R. T. Madden, Inc., supra,* at p. 547.

Similarly, this court has stated the rules governing the drawing of inferences from the evidence. In *Vocational, Technical and Adult Education District 13 v. DILHR and William Gosy,* 76 Wis.2d 230, 251 N.W.2d 41 (1977), this court stated:

> "If only one reasonable inference can be drawn from the evidence, the drawing of that inference is a question of law, and the circuit court is not bound by the determination of the Commission. If, however, different inferences can reasonably be drawn from the evidence, then a question of fact is presented and the inference actually drawn by the Commission, if supported by any credible evidence, is conclusive." 76 Wis.2d at p. 240.

As the circuit court recognized, the question in the instant case becomes what inference can be drawn from the evidence presented in this case regarding the instructions given Waters about oiling the machines. Because we conclude the finding made by the Commission that the supervisor's instruction not to oil the "machines" was ambiguous, was reasonable and permissible, we reverse the circuit court's judgment. Although the alternative findings as made by the circuit court that the instruction was not ambiguous is also reasonable, the actual finding of ambiguity as made by the Commission is supported by credible evidence and is thus conclusive. *See Vocational, Technical and Adult Education District 13 v. DILHR,* 76 Wis.2d at p. 240.

The appellant, George R. Waters, began working for Eastex Packaging Division in the summer of 1974. Eastex produces cardboard cartons and boxes. Waters was employed as a general laborer, specifically a "stock-hustler" or loader for the presses which cut and crease the cartons. The presses are operated by press-men who work on an elevated platform adjacent to the press. It is the press-men's responsibility to oil the presses.

The stock-hustler working on the ground level loads the cardboard stock at the input end of the press. The stock-hustler's job also consists of cleaning up around the press, emptying baskets, and helping the press-men on the platform lift the die when it is being replaced. Also, it is part of the stock-hustler's job, if he is not doing something else, to strip the excess cardboard from the cartons as they come off the press.

Testimony presented at the hearing established that Waters had never been instructed by anyone to oil the presses. On the other hand, testimony was also presented indicating that no one had ever told Waters not to oil the presses. The company did not provide a written job description covering the duties of a stock-hustler. Waters himself testified as to his understanding of his job and stated that he was told to ". . . load the press, clean up around the press and help the operators."

Pursuant to a collective bargaining agreement, the company had a system of disciplinary notice by which an employee was provided with a written notice whenever disciplinary action of reprimand, termination, suspension or discharge was imposed on such employee. The company also had several specific written rules which applied to all employees. Specifically, Rule #3 provided that:

"Employees will follow instructions of their supervisor." The minimum penalty provided for violation of Rule #3 was discharge.

Testimony was also received from the third shift supervisor for whom Waters was working at the time of his discharge. The supervisor testified that Waters didn't like to strip and that two or three times a week the supervisor would have to get after Waters to remain at his post. This often happened when Waters, without authorization, left his post and went to other areas in the plant to relieve other workers while they took breaks. The su-

pervisor testified that Waters often left his job as a stripper in contravention of orders.

The supervisor also testified about an incident which occurred on October 2, 1975, when Waters was assigned to Press #65 as a stock-hustler. According to the supervisor, Waters reported to him that he thought the motor or compressor on the press was overheating and that it needed oil. The supervisor testified as follows:

". . . He insisted that he put oil in it. I said no, I don't want you touching it. So we proceeded to walk towards the back of the machine. Then he remarked to me, don't you think I'm capable of oiling these presses? I said George, that's not the point. I don't want you oiling these presses or touching them. It's the maintenance or the operator's job to oil the presses . . . Machines, not presses. I said machines."

Testimony was also presented relating the events of the next night, October 3, 1975, when Press #65 was damaged. Waters was working his usual shift when he noticed that the two small oil cups which provide lubrication for the chain of the machine, were running out of oil. Waters testified that although he had no specific direction from anyone to fill the oil cups, he often did so when he saw that it needed to be done. He estimated he had filled the cups more than a dozen times in the past and stated that as far as he knew other stock-hustlers also often filled the cups. In fact, the president of the union testified that it was common for stock-hustlers to fill the oil cups and he had seen stock-hustlers, including Waters, do so on several occasions.

In order to refill the cups on October 3rd, Waters had to climb up onto the press-men's platform. After he had refilled one cup, he set the oil can down on a ridge on the machine and maneuvered to get into position to fill the second cup. As he did so, the oil can fell into the machine damaging the gripper bars which moved the

cardboard stock through the press. Waters testified, and it is not disputed, that this was an accident and that he did not intentionally drop the oil can into the press. The damage caused the press was later estimated to be $23,739.34, pro-rated over the remaining life expectancy of the press for a loss estimate of $4,547.62.

At the hearing when questioned as to why he was oiling the presses on October 3rd after his supervisor had told him on October 2nd not to oil the machines, Waters stated he thought the supervisor was talking about the motor or compressor. Specifically, Waters testified as follows:

> "*A.* He told me  not to oil it and I thought he was talking about the motor. He didn't say anything about what I normally—
> "*Q.* Like you should continue the normal things—
> "*A.* The things that I normally did.
> "*Q.* What was the conversation in October of 1975?
> "*Q.* Was that a compressor, or some reference to the compressor?
> "*A.* Yes, the compressor.
> "*Q.* Was that in reference to oiling the compressor?
> "*A.* Right."

As indicated above, Waters also testified that no one had ever told him specifically to oil the presses. Prior to October 2nd, he had been told nothing at all about oiling the presses. (It was on the basis of this latter testimony that the trial court concluded that the supervisor's October 2nd direction not to oil the machines could not be considered ambiguous. According to the trial court, because Waters had never been told to oil the machines, or any part thereof, the supervisor's instruction not to oil the machine could not reasonably be interpreted to be limited only to a direction not to oil the motor or compressor).

Following the October 3rd incident, Waters received a written notice of suspension effective October 6th, stat-

ing that he was indefinitely suspended ". . . pending further investigation of the incident on 10/3/75 that resulted in damage to the #65 Bobst press." This was the first written disciplinary notice that Waters had received from the employer. Subsequently, on October 17, 1975, he received a written notice of termination from the employer on which it was stated as follows:

"We have thoroughly reviewed the incident which occurred the morning of 10/3/75 and which resulted in damage to the #65 Bobst die cutting press. You have been on suspension during the investigation of this incident. It is now our conclusion that your involvement in this incident warrants discharge in accordance with Article XVI, sec. 3 and 4 of the Collective Bargaining Agreement between the company and the United Paper Workers International Union, Local #1202. This is to notify you that your employment at Eastex Packaging, Inc. —Forsberg Division—is terminated effective October 17, 1975."

According to the union president, these were the only two disciplinary notices contained in Waters' employment file.

Despite the fact that the reason for the discharge listed on Waters' termination notice was the incident of October 3, 1975, when a #65 press was damaged, the employer at the hearing in this case, and again on this appeal, states that it has never taken the position that anyone who has an accident or an error in judgment in the plant is subject to discharge. Rather, the employer contends that Waters' accidental damaging of the press was but one incident in a pattern of negligence and carelessness so frequent or recurrent that it constitutes misconduct within the meaning of sec. 108.04(5), Stats. Specifically at the hearing and again on appeal, the employer contends that Waters is guilty of misconduct barring him from unemployment compensation benefits because he consistently and intentionally disregarded and refused

to follow the instructions of his supervisor—such instructions including directions to do stripping, to stay on the job and not go to other areas in the plant, and to not oil the machines.

Most of the arguments made by the employer on this appeal concerning Waters' alleged consistent and recurrent failure to follow specific instructions given to him by his supervisor are immaterial. The appeal tribunal's finding in this case was limited to the specific instruction given Waters by his supervisor on October 2, 1975, to not oil the machines. The circuit court on review also limited its discussion to that particular instruction. On appeal, review is also limited to the finding regarding that instruction. It is not the function of the reviewing court to determine whether the findings that were not made should have been made or could have been sustained by the evidence. Rather, the inquiry on review is whether there is any credible evidence to sustain the findings that were in fact made. *Unruh v. Industrial Commission, supra,* at p. 398.

The employer contends, and apparently the circuit court agreed, that Waters' duties as a stock-hustler were clearly spelled out, and because such duties did not include oiling presses, he had no business doing so.

The meaning of misconduct for unemployment compensation purposes was defined by this court in *Boynton Cab Company v. Neubeck,* 237 Wis. 249, 259, 296 N.W. 636 (1941), as follows:

". . . the intended meaning of the word 'misconduct', as used in sec. 108.04 (4) (a), Stats., [now numbered 108.-04(5)] is limited to conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability,

wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as a result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute."

See also *Consolidated Const. Co., Inc. v. Casey*, 71 Wis. 2d 811, 817, 238 N.W.2d 758 (1976) ; *McGraw-Edison Co. v. DILHR*, 64 Wis.2d 703, 711, 221 N.W.2d 677 (1974) ; *Baez v. DILHR*, 40 Wis.2d 581, 588, 589, 162 N.W.2d 576 (1968) ; *Fitzgerald v. Globe Union, Inc.*, 35 Wis.2d 332, 338, 151 N.W.2d 136 (1967) ; *Liebmann Packing Co. v. Industrial Commission*, 27 Wis.2d 335, 339, 134 N.W.2d 458 (1965) ; *Milwaukee Transformer Co. v. Industrial Commission*, 22 Wis.2d 502, 511, 126 N.W.2d 6 (1964) ; *Cheese v. Industrial Commission*, 21 Wis.2d 8, 16, 123 N.W.2d 553 (1963).

Furthermore, when determining whether a worker's conduct is "misconduct" which will disqualify such worker from unemployment compensation benefits, the employee's behavior must be considered as an intentional and unreasonable interference with the employer's interests. *Milwaukee Transformer Co. v. Industrial Commission, supra*, 22 Wis.2d at 511, 512.

We conclude on the record before us that oiling the cups on the press when they were empty and obviously in need of replenishing, cannot be considered an intentional and unreasonable interference with the employer's interest. On the contrary, the act of refilling the oil cups when needed, can be considered an act done in furtherance of the employer's interests. It is protective maintenance aimed at preserving the functioning of the expensive press. Furthermore, Waters viewed the job of

stock-hustler as including the duty to help the press-men. The press-men had the responsibility to oil the machines. Therefore, when Waters oiled the machine he was, in a broad sense, helping the press-men and was furthering the employer's interests. The only act of Waters which clearly was not done in the employer's interest was the dropping of the oil can into the press. However, it is undisputed that this was not an intentional act on Waters' part. Mere inefficiency, unsatisfactory conduct, ordinary negligence, and isolated instances of good-faith errors in judgment or discretion, are not misconduct within the meaning of the statute. *Boynton Cab Company, supra,* 237 Wis. at 259, 260.

Because Waters admittedly had oiled the press more than a dozen times in the past, the circuit court concluded that each individual act must be considered an act of carelessness in disregard of the employer's interest, and that therefore there was no credible evidence to support the Commission's finding that the October 3rd incident was an isolated act of carelessness. The circuit court's conclusion cannot withstand scrutiny. There is credible evidence in this record to establish that October 2nd was the first time Waters was ever specifically told anything about oiling the presses. His testimony, which the appeal tribunal and the Commission were entitled to believe, clearly established that prior to that date, no one had said anything to him at all regarding oiling or not oiling the presses. Consequently, his act of oiling the presses more than a dozen times prior to October 3rd cannot be deemed a course of inimical conduct. At the time he oiled the presses in the past, he was not in violation of any specific instructions from his supervisor.

Prior to October 2nd, there was never any specific direction, either written or oral, given to Waters prohibiting him from oiling the press. However, even if

there had been, it is well-established that a violation of a valid work rule may justify discharge, but at the same time may not amount to statutory misconduct for unemployment compensation purposes. *Consolidated Construction Co., Inc. v. Casey, supra,* 71 Wis.2d at p. 819–820, and cases cited therein. The law presumes that the employee is not disqualified from unemployment compensation and places on the employer the burden of introducing credible evidence sufficient to convince DILHR that some disqualifying provision should bar the employee's claim. *Kansas City Star v. DILHR,* 60 Wis.2d 591, 602, 211 N.W.2d 488 (1973). No such disqualification exists in the instant case. The accident which led up to Waters' discharge involved the routine performance by him of an assumed task. He had oiled the presses before and had never been criticized nor reprimanded for doing so. Replenishing the oil in the cups is an act of general maintenance or labor involving no specialized skills. He had done this in the past without incident. The accident on October 3rd was, as the Commission found, an isolated event of carelessness. His conduct was unintentional and therefore cannot be considered misconduct as that term is used in sec. 108.04 (5), Stats. The record contains credible evidence to support this conclusion. Accordingly, the judgment of the circuit court must be reversed with directions to reinstate the order of the Industry, Labor and Human Relations Commission.

The judgment is reversed.