THE WEHR STEEL COMPANY, Petitioner-Appellant,

v.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS,
Thomas Du Charme, George E. Purifoy and Walter
L. Breedlove, Respondents-Petitioners.

Supreme Court

*No. 80–1393. Argued January 4, 1982.—Decided February 2, 1982.*

(Also reported in 315 N.W.2d 357.)

For the Department of Industry, Labor and Human
Relations the cause was argued by *Robertamarie Kiley,*

attorney, with whom on the briefs was *James L. Pflasterer,* legal staff director.

For the appellant there was a brief by *Marshall R. Berkoff, Thomas W. Scrivner* and *Michael, Best & Friedrich* of Milwaukee, and oral argument by *Mr. Scrivner.*

Amicus curiae brief was filed by *James G. Derouin, Richard J. Lewandowski* and *DeWitt, Sundby, Huggett & Schumacher, S.C.,* of Madison, for Wisconsin Association of Manufacturers and Commerce.

STEINMETZ, J.  The issue in this case is what test or standard is to be applied in determining whether the total circumstances of a record demonstrate an employee's leaving work without permission of the employer is conduct which is misconduct under the meaning of sec. 108.04(6)(a), Stats.[1]

This case has been involved in many levels of the decision-reviewing process.  The initial determination was made by a properly delegated Department of Industry, Labor and Human Relations' examiner on August 18, 1978.  That decision determined that the claimant employees committed misconduct under the facts which will be set forth later.  The next review was considered by an appeal tribunal which is one of approximately 26 hearing examiners employed by the Department of Industry, Labor and Human Relations, and this tribunal also found misconduct was committed by the employees.

The issue then was considered by the Labor and Industry Review Commission which is the state agency

---

[1] Sec. 108.04(6)(a), Stats., provides:

"(6) DISCIPLINARY SUSPENSION. As to an employe's weeks of unemployment by reason of a disciplinary suspension by a given employer, the employe shall be ineligible for benefits as follows:

"(a) If the suspension was for misconduct connected with his employment, he shall be ineligible from the given employer's account for each such week and ineligible from other previous employer accounts for the first 3 such weeks."

responsible for Wisconsin administrative review determinations in three subject areas: equal rights, worker's compensation and unemployment compensation. This commission found the employees were suspended for actions which did not constitute misconduct, and, therefore, they were eligible for unemployment benefits under sec. 108.03, Stats.[2]

The case was appealed to the circuit court for Milwaukee county, the Honorable Leo B. Hanley, Reserve Judge, presiding. Judge Hanley entered judgment on May 23, 1980, affirming the findings and decision of the review commission which found no misconduct.

An appeal was taken by the employer to the court of appeals which reversed the decision of the circuit court on May 7, 1981, at 102 Wis. 2d 480. The court of appeals remanded the case to the review commission for a proper finding of fact as to whether, under all the facts and circumstances, the heat in the industrial plant did in fact constitute a health and safety hazard to the claimants.

---

[2] Sec. 108.03, Stats., provides:

"108.03 **Payment of benefits.** (1) Benefits shall be paid to each unemployed and eligible employe from his employer's account, under the conditions and in the amounts stated in (or approved by the department pursuant to) this chapter, and at such times, at such places, and in such manner as the department may from time to time approve or prescribe.

"(2) The benefit liability of each employer's account shall begin to accrue under s. 108.06 in the first week completed on or after the first day of that calendar year within which his contributions first began to accrue under this chapter.

"(3) When an employer, after due notice of a benefit claim, has conceded liability or failed to file the required report, or has failed to raise any eligibility question in objection to such claim, any benefits allowable under any resulting benefit computation shall, unless the department has taken administrative notice of any fact indicating the claimant's ineligibility, be promptly paid. Any eligibility question in objection to such claim thereafter raised by the employer shall not affect benefits paid prior to the end of the week in which a determination is issued as to such eligibility question."

The commission petitioned this court for a review of the court of appeals decision.

The Wehr Steel Company manufactures steel castings. At the time the employee conduct which is at issue occurred, Walter Breedlove had worked for Wehr Steel for five years as a finisher in the roll-over molding department of the foundry. Thomas Du Charme had worked for the company for approximately nine months in the same capacity. That job position entails finishing the molds by putting the core in, closing the molds, packing them and completing the mold. The metal is poured as close as ten to fifteen feet away from the finishers. George Purifoy had worked for Wehr Steel for almost five years. He was a gaggerman who made reinforcements that are used to put the molds together. He worked some 30 feet from station four, which was the work station of Breedlove and Du Charme.

On two occasions in July of 1978, July 7 and July 19, the named claimants, among others, walked off their jobs without permission claiming it was too hot to work. On July 7, the three claimants and six other employees left work. On July 19, approximately 17 employees, out of a work force of 530, walked off their jobs.

Written disciplinary warnings were issued to the claimants for leaving without permission on July 7. They were told they had violated plant rule 14,[3] which requires employees to have "permission from their foreman to leave their department during working hours," and also warned that a repetition would result in immediate discharge.

---

[3] "WEHR STEEL COMPANY CODE OF CONDUCT

"This code of conduct is intended as a guide for our employees while at work. Disregard of this code will be cause for disciplinary action, the severity depending on the nature of the act.

". . .

"14. Employees must have permission from their foreman to leave their department during working hours. Employees will not be required on excessively hot days to be checked through the Medical Department."

The claimants, among others, again walked off their jobs without permission on July 19, 1978. Around 4 p.m., approximately one hour after their shift began that day, the claimants and others told Nancy Zettel, the supervisor in the roll-over molding unit, that they were going home because it was too hot. Zettel reminded the employees of the recent disciplinary warnings, and stated they did not have her permission to leave.

The threatened walkout was reported to Charles Harwell, the plant manager. All employees, including the claimants, were called to the conference room at approximately 4:30 p.m. Harwell explained there were "customers depending on us" and that the employer had production obligations to meet. The outside temperature was 84° and Harwell indicated conditions were not "excessively hot" in the foundry that day. The employees were advised that if heat became a problem, they would be granted extra breaks, extra relief would be made available, and refreshments and salt tablets would be supplied. They were also informed that if they felt management's actions were improper, their proper course of action was to file a grievance through the union, not to walk out. Employees were specifically advised that anybody walking out without permission would be "facing discharge."

Most of the 530 plant employees who worked on July 19 completed their shifts. One employee went home with permission, since he was ill. Only approximately 17 of the 200 second shift employees left without permission. Breedlove and Du Charme left at 5:25 p.m. and Purifoy left at 5:28 p.m. Initially, the individual claimants were discharged. The discharges, however, were subsequently converted to disciplinary suspensions without pay based upon an agreement reached with their labor organization.

It is undisputed that employees can obtain permission to leave, because of the heat, from either of two sources: their foreman or the medical department.

This court in *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 259–60, 296 N.W. 636 (1941), fashioned the following definition of misconduct:

"[Misconduct is] . . . conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute."

The scope of judicial review of the commission's decision is set forth in sec. 108.09 (7), Stats.,[4] and is limited to questions of law.

[4] Sec. 108.09 (7), Stats., provides:

"(7) JUDICIAL REVIEW. (a) Either party may commence judicial action for the review of a decision of the commission under this chapter after exhausting the remedies provided under this section if the party has commenced such judicial action in accordance with s. 102.23 within 30 days after a decision of the commission is mailed to a party's last-known address.

"(b) Any judicial review under this chapter shall be confined to questions of law, and the provisions of ch. 102 with respect to judicial review of orders and awards shall likewise apply to any decision of the commission reviewed under this section. In any such judicial action, the commission may appear by any licensed attorney who is a salaried employe of the commission and has been designated by it for this purpose, or at the commission's request by the department of justice.

"(c) If, as a result of judicial review of a commission decision denying an employe's eligibility for benefits, it is finally determined that benefits are payable, they shall be calculated as of the date of the commission's decision."

Sec. 102.23(1), Stats., provides that "[t]he findings of fact made by the commission acting within its powers shall, in the absence of fraud, be conclusive," and sec. 102.23(1)(d) states that an order or award of the commission or a judgment rendered thereon "shall be set aside only upon the following grounds:

"1. That the commission acted without or in excess of its powers.

"2. That the order or award was procured by fraud.

"3. That the findings of fact by the commission do not support the order or award."

Sec. 102.23(6), Stats., further states:

"(6) If the commission's order or award depends on any fact found by the commission, the court shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact. The court may, however, set aside the commission's order or award and remand the case to the commission if the commission's order or award depends on any material and controverted finding of fact that is not supported by credible and substantial evidence."

■■
Though the commission's findings of fact are conclusive on appeal as long as they are "supported by credible and substantial evidence," sec. 102.23(6), Stats., any legal conclusion drawn by the commission from its findings of fact is subject to judicial review. The court is not bound by the agency's determination of a question of law. *Nottelson v. ILHR Department*, 94 Wis. 2d 106, 287 N.W.2d 763 (1980); *Vocation. Tech. & Adult Ed. Dist. 13 v. ILHR Dept.*, 76 Wis. 2d 230, 243, 251 N.W.2d 41 (1977).

In *Milwaukee Transformer Co. v. Industrial Comm.*, 22 Wis. 2d 502, 509–10, 126 N.W.2d 6 (1964), we stated:

"It is well recognized that the court must accept the commission's determinations on such findings of fact if supported by credible evidence on the record as a whole.

"On the other hand, any determination that [the employee's] conduct was 'misconduct' within the standards set forth under sec. 108.04(5), Stats., is a conclusion of law."

The court then quoted *Cheese v. Industrial Comm.*, 21 Wis. 2d 8, 15, 123 N.W.2d 533 (1963):

" '*With respect to the second point of difference,* insofar as a person's acts, or his intent in doing such acts, are questions of fact, where the evidence and reasonable inferences therefrom would support any one of two or more findings, a finding by the commission is conclusive.

" 'Here, however, the question is whether the facts fulfill a particular legal standard. This court determined that the term "misconduct connected with his employment" as used in sec. 108.04(5), Stats., was an ambiguous term of doubtful meaning, and found it necessary to interpret it with the view of effecting the general purpose of the legislature.

" 'We consider that the difference between the appeal tribunal's evaluation of claimant's conduct and that of the commission is really a question of law, and the commission's determination does not bind us.' "

In *Milwaukee Transformer, supra,* at 511–12, we further held:

"When determining whether a worker's conduct is 'misconduct' which will disqualify him from the benefits of the program, the employee's behavior must be considered as an intentional and unreasonable interference with the employer's interest. [*See also Eastex Packaging Co. v. DILHR,* 89 Wis. 2d 739, 752, 279 N.W.2d 248 (1979).] . . .

"The unemployment compensation statute is not a 'little' labor relations law. The critical question is whether [the employee's] conduct was an intentional and unreasonable interference with her employer's interest, regardless of what construction was put on the rules [of the employer] or the reasonableness of those rules."

The fact that the focus is on the employee's conduct rather than the merits of the company rule or the company's right to discharge employees who violate the rule, was reiterated in *Consolidated Const. Co., Inc. v. Casey*, 71 Wis. 2d 811, 819–20, 238 N.W.2d 758 (1976):

"We would emphasize that the ultimate legal question here is not whether [the company's] grooming code was legally valid, or whether [the company] could discharge [the employee] for his refusal to comply. The question is only whether there was statutory 'misconduct.' The principle that violation of a valid work rule may justify discharge but at the same time may not amount to statutory 'misconduct' for unemployment compensation purposes has been repeatedly recognized by this court. *Fitzgerald v. Globe-Union, Inc.* (1967), 35 Wis. 2d 332, 151 N.W.2d 136; *Milwaukee Transformer Co. v. Industrial Commission* (1964), 22 Wis. 2d 502, 126 N.W.2d 6."

The objective test to be applied in determining whether an employee's conduct was "misconduct" was stated in *Universal Foundry Co. v. ILHR Department*, 86 Wis. 2d 582, 591–92, 273 N.W.2d 324 (1979):

"We are called upon to determine whether a reasonable person under the factual situation presented would have considered [the employee's] conduct to be a willful interference with the company's interests. . . .

"Applying the objective test of what a reasonable person would have intended and what conclusion a reasonable person would have drawn from the language of the signs, we must conclude . . . ."

In the present "Findings of Fact and Conclusions of Law," the Labor and Industry Review Commission, in relevant part as to each claimant, held:

"While the Commission recognizes that an employer has a legitimate right to expect that production will not be interrupted by the actions of workers who leave the

work place without authorization, nevertheless that right is not absolute. It must be balanced against a correspondingly legitimate interest, the worker's right to work in a safe work environment. *If an employe in good faith reasonably believes* that working conditions present a health or safety hazard to him, the Commission considers that a worker has the right to leave the work place, regardless of company approval. Any subsequent disciplinary suspension imposed by an employer for such conduct would under those circumstances have no effect on the employe's eligibility for unemployment compensation benefits.

"Here, the temperature on the evening of July 19, 1978, was approximately 84° Fahrenheit with the temperature in the foundry itself even higher. Since it appeared that all the workers in the foundry initially expressed an intention to leave the plant because of the heat in the foundry, the Commission considers that the concern over the heat in the foundry and its potential effect on the health and safety of the workers certainly was genuine and justified. The employer itself recognized that fact by its authorization of additional breaks and refreshments for the work force. Moreover, subsequent to July 19, 1978, the employer changed its operations to have workers work on the third shift rather than the second shift, another obvious recognition of the difficulty of its workers to safely carry out work assignments in the foundry during the hot summer months. Furthermore, the Commission notes that based on evidence submitted at the hearing, on many occasions temperature levels after July 19, 1978, when the change in operation took place, were less than those on the evening of July 19, 1978. In addition, the fact that many of the workers remained on the job for the duration of the shift on the evening of July 19, 1978, does not in the Commission's judgment lessen the genuiness [sic] of the concern of the workers regarding the heat, given the employer's ultimatum that any worker who left the job on that evening without permission would be discharged. Taking all of these factors into consideration and also the testimony of the employe who testified that he believed that he would be unable to continue working due to the excessive heat in the foundry on the evening of July 19, 1978, the Commission considers that his actions in leaving the work place on that evening

were based on the *good faith belief* that working conditions imposed a danger to him." (Emphasis added.)

The test is not what a particular employee in good faith reasonably believes as to what working conditions give the employee a right to leave the work place regardless of employer approval. That would be purely a subjective test. The correct test is what a reasonable person would reasonably believe as to whether a given set of working conditions presented a hazard to health or safety.

The test applied by the court of appeals was whether or not a health or safety hazard *actually* existed. The perceived hazard is one of the factors to be considered in the totality of the circumstances considered by the commission, but is not the exclusive factor. The critical question is not whether the hazard actually existed, but rather whether a reasonable person under the same or similar circumstances would have believed that an unreasonable health or safety hazard existed by virtue of the heat and humidity within the plant which justified walking off the job.

Neither the commission nor the court of appeals applied the proper legal test to the totality of the circumstances. The correct test is the objective test of what a reasonable person would have reasonably believed with respect to whether the existing conditions and circumstances constituted a hazard to the health or safety of the employee. The case is therefore remanded to the Labor and Industry Review Commission for application of the proper legal rule to the record and conclusions to be determined by the commission.

Claim was also made by the petitioner that the commission on appeal stated alleged factors underlying the inference of "good faith" that were not stated in the findings relied on in its decision. This court has ruled on that

subject previously in *Transport Oil, Inc. v. Cummings,* 54 Wis. 2d 256, 265, 195 N.W.2d 649 (1972) as follows:

"This court has long been committed to the proposition that administrative agencies are to be given broad power within their respective jurisdictions and this court is hesitant to interfere with administrative determinations. In order for this balance between the administrative and judicial branches of government to be effective, however, it is essential that the agency exercise the power the legislature has given it. Such power requires a clear articulation of the reasons for a particular determination. When the agency 'enters an order authorized by the act upon a set of facts which are supported by the evidence, that order is immune from judicial attack.'"

*See also, Transamerica Ins. Co. v. ILHR Department,* 54 Wis. 2d 272, 281–85, 195 N.W.2d 656 (1972); *State ex rel. Ruthenberg v. Annuity & Pension Bd.,* 89 Wis. 2d 463, 476, 477, 278 N.W.2d 835 (1979).

Since the court is remanding the case to the commission for application of the objective test stated in this decision, the commission will be required to apply the test to the total circumstances and record and should, therefore, state all factors on which it relies for its decision.

The case is remanded to the Labor and Industry Review Commission for action consistent with this opinion.

*By the Court.*—The decision of the court of appeals is modified and as modified, affirmed.

WILLIAM G. CALLOW, J. *(concurring).* I agree with the majority that the objective test should be utilized in determining whether an employee's conduct evinces a willful and substantial disregard of the employer's interests in order to constitute misconduct within the *Boynton Cab* definition of that term. I write separately, however, to amplify the test articulated in the *majority* opinion. The majority states that the correct test in determining whether *Boynton Cab* "misconduct" has oc-

curred focuses on "what a reasonable person would reasonably believe as to whether a given set of working conditions presented a hazard to health or safety." (*Supra*, at 121.)

I believe that the proper standard for testing the alleged misconduct is as follows: Was the employee's *conduct* reasonable in light of the facts and circumstances purported to constitute a health or safety hazard? In other words, did the employee act as a reasonable person would have acted under the same or similar conditions? One may have a reasonable *belief* that a hazard exists, but under *Boynton Cab* we have directed examination at the *conduct* which stems from that belief. Although one's belief that a hazard exists may be reasonable, one's conduct, in the light of that belief, may not be reasonable.

The majority, in criticizing the court of appeals *"actual* hazard" test, observes that a "perceived hazard is one of the factors to be considered in the totality of the circumstances considered by the commission . . . ." (*Supra* at 121.) I would require the commission to make a factual finding, supported by sufficient credible evidence,[1] of the existing circumstances which are purported to constitute a health or safety hazard. While finding that an actual health or safety hazard exists is not a condition precedent to a worker's recovery of unemployment compensation benefits, the circumstances precipitating the worker's conduct are certainly relevant to the inquiry. I believe that an objective test, by necessity, requires the commission to identify the existing conditions purported to constitute a health or safety hazard. The commission's assessment of the worker's conduct must be based upon identifiable reasons articulated in relation to the existing circumstances in the work place. I believe that such inquiry is consistent with prior decisions of this court. In

[1] *R.T. Madden, Inc. v. ILHR Dept.*, 43 Wis.2d 528, 548, 169 N.W. 2d 73 (1969).

*Consolidated Construction Co., Inc. v. Casey,* 71 Wis. 2d 811, 238 N.W.2d 758 (1976), we remanded to the commission "for a finding of whether [claimant's] beard was actually a potential hazard under the circumstances of his job." *Id.* at 818. We concluded that this factual finding was necessary in order to determine whether an employer's rule prohibiting beards was reasonable and whether the claimant's conduct in maintaining the beard constituted misconduct.

Similarly, in *Kohler Co. v. Industrial Commission,* 272 Wis. 310, 75 N.W.2d 293 (1956), we confronted the issue of whether employees were "too sick to work." We concluded:

"The question to be determined by the commission was whether the men were sick at the time they left the factory or if they were feigning sickness as claimed by the employer. The question for determination upon these appeals is whether or not there is sufficient evidence in the record to sustain that finding of sickness." *Id.* at 321.

The majority has refined the inquiry articulated in the *Consolidated* and *Kohler* holdings by concluding that the objective standard is measured by the reasonable person's belief. I believe those cases illustrate that factual findings on existing conditions purported to constitute a health or safety hazard are essential to the determination of whether the conduct was reasonable.

It bears noting that a factual finding on the existing circumstances compels inquiry regarding any mitigating or remedial actions the employer may have taken to reduce the conditions purported to threaten employee health or safety, as well as any alternatives available to the employee other than leaving his place of employment. We want to encourage employers to take preventive and remedial action to safeguard employees, and often such measures do have a direct bearing on whether employee conduct was reasonable. Thus, a factual finding on

existing conditions purported to constitute a health or safety hazard includes inquiry regarding any remedial steps an employer may have taken. While an employee's conduct in leaving the job may be reasonable in view of immediate conditions, it may not be reasonable if the employer is taking appropriate remedial measures which will alleviate the threatening conditions or if the employee is presented with viable alternatives to leaving.

I agree with the majority that an objective test is appropriate to evaluate a worker's conduct in determining whether unemployment compensation benefits are to be granted. I would direct the commission, however, in evaluating a worker's conduct pursuant to *Boynton Cab* to assess whether the claimant's conduct was reasonable in relation to specific findings concerning the conditions purported to constitute a health or safety hazard. In making specific findings, the commission must consider the employee's alternatives to leaving the place of employment and any remedial measures taken by the employer to alleviate the purportedly hazardous conditions.