394

Marathon Electric Manufacturing Corporation, Appellant, vs. Industrial Commission and another, Respondents. [Two cases.] *

*March 8—April 5, 1955.*

* Motion for rehearing denied, without costs, on June 1, 1955.

For the appellant there was a brief by *Lines, Spooner & Quarles,* attorneys, and *John G. Kamps* and *Laurence E. Gooding, Jr.,* of counsel, all of Milwaukee, and oral argument by *Mr. Kamps* and *Mr. Gooding.*

For the respondent Industrial Commission there was a brief and oral argument by *Arnold J. Spencer* and *Austin T. Thorson,* both of Madison.

CURRIE, J.   It is stated in the briefs that the appeal in these two cases and that of the four companion cases of *Streeter v. Industrial Comm.,* post, p. 412, 69 N. W. (2d) 583, are test cases which will govern the rights of many other former employees of the employer who have claims pending for unemployment compensation benefits.

On this appeal the following issues are presented:

(1) Is the commission's finding of fact, that employees Jones and Dickinson were discharged by the employer in February, 1952, supported by the evidence?

(2) Have these two employees' rights to unemployment compensation benefits been suspended for the period covered in the employees' applications because of the provisions of sec. 108.04 (10), Stats., relating to labor disputes?

(3) Did the refusal of these two employees to apply to the employer for work as requested in the employer's letter of March 5, 1952, bar them from benefits under the provisions of either sec. 108.04 (1) (a) or 108.04 (8) (a), Stats.?

In considering the first of these three questions we find that sec. 108.09 (7) of the Wisconsin Unemployment Compensation Act (ch. 108) makes the provisions of ch. 102, Stats. (the Wisconsin Workmen's Compensation Act), with respect to judicial review applicable to court review of decisions of the commission under ch. 108, Stats. Therefore, the findings of fact of the commission in the instant appeal are conclusive on this court if there is any credible evidence which, if unexplained, would support such findings. *Hills Dry Goods Co. v. Industrial Comm.* (1935), 217 Wis. 76, 85, 258 N. W. 336; *Motor Transport Co. v. Public Service Comm.* (1953), 263 Wis. 31, 46, 56 N. W. (2d) 548.

The finding of fact of the commission covering the question of whether there had been a discharge is as follows:

"The letters, dated February 29, 1952, that were sent to the employee and the other factory workers informed them that they were discharged. This discharge terminated the employer-employee relationship. . . ."

The material portion of the identical letters mailed to the employees Jones and Dickinson on February 29, 1952, by the employer, read as follows:

"Since the action taken by the union and its members Thursday afternoon was the second such violation resulting from irresponsible leadership, the company has no alternative but to consider that all participants have forfeited any rights as employees and are accordingly being removed from the company pay roll. This means that all employee benefits such as group insurance, vacation plans, holiday-pay plans, etc., are being eliminated immediately."

It is contended by the employer that these letters only purported to discharge participants in the unauthorized walkout of February 28th, and, inasmuch as neither Jones nor Dickinson were at work when the walkout occurred, they were accordingly not discharged. However, the employer's president Wall, who signed these letters and authorized send-

ing them out, when asked whether such letter terminated the employer-employee relationship of all the employer's factory workers, answered unequivocally as follows:

"I think that the February 29th letter did."

Not only did Wall so interpret the February 29th letters but both Jones and Dickinson testified that they also interpreted such letters as discharging them. The fact that the employer sent such letter to Jones and Dickinson is also very significant. The employer's time-card records of each employee contained the information as to which employees had been at work and which had not when the walkout occurred and there, therefore, was no reason for sending the February 29th letter to employees such as Jones and Dickinson unless their discharge was intended to be accomplished thereby. The locking of the factory gates so as to bar Jones and Dickinson as well as other employees from work also bears on the interpretation to be placed on the letter. Furthermore, the ensuing letter from the employer to these two employees dated March 5, 1952, contained this sentence: "You should know, that unfortunately, this union action forces us to consider everyone who is rehired to be a new employee." Such a statement is certainly consistent with the hypothesis that the employer then considered that something had already occurred which had terminated the employer-employee relationship.

We are constrained to hold that there was sufficient credible evidence to support the commission's finding as to the discharge. Sec. 108.04 (5), Stats., bars an employee from benefits who has been discharged for misconduct, but the employer does not contend that these two employees were guilty of any act of misconduct justifying their discharge, nor would the evidence sustain such a finding.

Sec. 108.04 (10), Stats., provides as follows:

"An employee who has left (or partially or totally lost) his employment with an employer because of a strike or other

*bona fide* labor dispute shall not be eligible for benefits from such (or any previous) employer's account for any week in which such strike or other *bona fide* labor dispute is in active progress in the establishment in which he is or was employed."

Except as to week No. 9 of 1952 (the week in which the walkout of February 28th occurred), both the appeal tribunal and the commission found that sec. 108.04 (10), Stats., did not bar Jones and Dickinson from benefits. However, they reached such result on different grounds as noted in the statement of facts preceding this opinion. The appeal tribunal found that these employees had not lost their employment because of a labor dispute but by reason of a discharge for alleged breach of the collective-bargaining agreement. Assuming this hypothesis, the statute would not apply to these two employees regardless of whether or not a labor dispute continued in progress after their discharge. On the other hand, the commission determined that Jones and Dickinson lost their employment "because of a labor dispute which was in active progress" and thereby were barred from benefits for week No. 9. However, by reason of its finding that the letter of February 29th terminated the employment of all of the employees with whom the employer was engaged in the labor dispute, the commission held this terminated the dispute so that there was then no longer a labor dispute in progress which would bar these two employees from benefits as to the weeks subsequent to week No. 9.

It is our considered judgment that the conclusion reached by the appeal tribunal is more nearly correct than that of the commission. The commission's determination of this issue, which under the facts of this case presents a question of statutory construction, constitutes a conclusion of law and not a finding of fact, and, therefore, is not binding upon us on this appeal.

In order to better interpret the meaning of sec. 108.04 (10), Stats., we deem it advisable to ascertain the legislative

objective or policy sought to be attained by its enactment. The views of the commission, which for many years has been administering the Wisconsin Unemployment Compensation Act, as to the legislative policy underlying this particular section are entitled to great respect. The commission's conclusion as to this is stated in its brief as follows:

"Since the enactment of the first Unemployment Compensation Law in 1931, the law has contained a provision suspending eligibility of workers unemployed because of a strike or a *bona fide* labor dispute. The labor-dispute provision constitutes a 'neutrality act' which the legislature inserted into the act. It is to be borne in mind that the Unemployment Compensation Act was prepared by representatives of labor and management and the public. In designing this legislation, it was the fear of both employer and employee representatives that payment of unemployment compensation, unless appropriate safeguards were taken, might prove to be an instrument which might be inappropriately used, their respective interests considered, in an industrial controversy. An analysis will show the wisdom from both the standpoint of labor and of management of suspending benefit payments in any situation in which these industrial forces are engaged in a *bona fide* controversy. This suspension of benefits places the administrative agency in a neutral position with respect to the contending forces.

"Under the Wisconsin law, employer contributions finance the unemployment benefits paid to workers. Management, therefore, is not desirous that the funds built up by it could be used to finance a strike or other form of labor controversy directed against it. Present law takes a 'hands off' approach. *It stays neutral.* It does not require that the administrative agency determine the merits of the labor dispute. *If there is a controversy or labor dispute, then the disputants, are ineligible for unemployment benefits during the active progress of such dispute.*"

Another material factor to be considered in construing sec. 108.04 (10), Stats., is the continuing relationship that is held to exist between an employer and its employees dur-

ing a labor dispute in which a strike or lockout is in progress. A statement giving recognition to the existence of such continuing relationship, and characterizing its nature, which has received wide acceptance in subsequent decisions, is to be found in the concurring opinion of Judge GROSSCUP in *Iron Molders' Union v. Allis-Chalmers Co.* (7th Cir. 1908), 166 Fed. 45, 52, 20 L. R. A. (N. S.) 315:

"A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lockout completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or weather the lockout do so that they may be ready to go to work again on terms to which they shall agree—the employer remaining ready to take them back on terms to which he shall agree. Manifestly, then pending a strike or a lockout, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment."

A recent opinion by the Massachusetts court which summarizes the view that a strike does not end the employer-employee relationship is *Gentile v. Director of Division of Employment Security* (1952), 329 Mass. 500, 503, 109 N. E. (2d) 140, 142, wherein it was stated:

"This court has said that 'in the absence of a statute it has been generally regarded that employees who quit their work to wage a lawful strike in a lawful manner still continue as employees, at least in reference to matters connected with the strike.' *Mengel v. Justices of the Superior Court*, 313 Mass. 238, 242, [47 N. E. (2d) 3, 6]. See *Iron Molders' Union No. 125 of Milwaukee v. Allis-Chalmers Co.*, [8 Cir.], 166 F. 45, [20 L. R. A., N. S., 315]; *Michaelson v.*

*United States* [8 Cir.], 291 F. 940; *Jeffery-De Witt Insulator Co. v. National Labor Relations Board* [4 Cir.], 91 F. (2d) 134, [112 A. L. R. 948]; *Mark Hopkins, Inc. v. California Employment Commission,* 24 Cal. (2d) 744, [151 Pac. (2d) 229, 154 A. L. R. 1081]; *Sandoval v. Industrial Commission,* 110 Colo. 108, 119–120, [130 Pac. (2d) 930]; *State v. Personett,* 114 Kans. 680, [220 Pac. 520]; *Keith Theatre Inc. v. Vachon,* 134 Maine, 392, [187 A. 692]; *Deshler Broom Factory v. Kinney,* 140 Neb. 889, [2 N. W. (2d) 332]; *Greenfield v. Central Labor Council,* 104 Ore. 236, [192 P. 783, 207 P. 168]; *Uden v. Schaefer,* 110 Wash. 391, [188 P. 395, 11 A. L. R. 1001]."

On the basis of these authorities we are constrained to conclude that when the legislature used the phrase *"lost . . . employment with an employer because of a strike or other bona fide labor dispute"* in sec. 108.04 (10), Stats., it did not have in contemplation a situation where the relationship of employer and employee was completely terminated, but rather one in which the employee was performing no work for the employer. In other words, what was intended was not the loss of the status of an employee relationship but rather the loss of work. The word "employment" is defined in sec. 108.02 (5) in terms of "service" and not status. Furthermore, an analysis of other subsections of sec. 108.04 discloses that the legislature has used the words "terminated" or "termination" with respect to "employment" when an absolute ending of the employee status was intended, and, therefore, we deem something apart and different than "termination" was intended by the use of the word "lost."

We conclude that sec. 108.04 (10), Stats., should be construed as only applicable to those persons still retaining an employee status who are out of work due to a *bona fide* labor dispute; and as to such employees there is a complete suspension of benefits for the duration of the period that the dispute remains in active progress. If the employer during the progress of such dispute elects to terminate the employee

status of any employee by discharging him, the possible liability of the employer's account for unemployment compensation benefits to such discharged employee is governed by the portions of sec. 108.04, other than sub. (10), applicable to cases of absolute termination of employment. For example, if the ground of discharge is alleged misconduct, the applicable subsection which governs is sec. 108.04 (5) and it is immaterial whether or not such discharge is based on conduct of the employee having a direct relation to the labor dispute.

This construction of sec. 108.04 (10), Stats., is in keeping with the legislative policy underlying its enactment of protecting employers against having to finance a strike against themselves, as would be the case if their accounts were liable for the payment of unemployment compensation benefits to their employees while absent from work during the course of the dispute. The employer receives the full benefit of the protection of this subsection during the progress of the labor dispute so long as it does not take affirmative action to end the employee status of the employee. If it does elect to terminate such status during the progress of the labor dispute the reason for the affording of such protection disappears. In other words, it seems to us that one of the purposes of sec. 108.04 (10) is to preserve the *status quo* during the course of the labor dispute so that at its cessation the parties thereto stand in the same relation to each other as at its beginning in so far as payment of benefits under the act are concerned. When the active progress of the dispute has ended those employees who return to work receive no benefits, while those offering to return but are not accepted by the employer then become eligible for benefits. There is no good reason why an employee, who has been wrongfully discharged weeks or months before the ending of the progress of the dispute, should be barred from benefits during the time that the dispute continued in progress following such discharge.

This brings us to the remaining issue to be passed upon on this appeal, viz., did the failure of Jones and Dickinson to present themselves for work at the employer's plant pursuant to the employer's letter of March 5, 1952, bar them from benefits under either subs. (1) (a) or (8) (a) of sec. 108.04, Stats.? These two subsections provide as follows:

Sec. 108.04 (1) (a) "An employee shall be ineligible for benefits for any week in which he is with due notice called on *by his current employer* to report for work actually available within such week and is unavailable for work or physically unable to do his work." (Italics supplied.)

Sec. 108.04 (8) (a) "If an employee fails either to apply for work when notified by a public employment office *or to accept work when offered to him,* and such failure was *without good cause* as determined by the commission, he shall be ineligible for the week in which such failure occurs and thereafter until he has again been employed within at least four weeks and has earned wages equaling at least four times his weekly benefit rate." (Italics supplied.)

Clearly sec. 108.04 (1) (a), Stats., has no application because at the time the employer wrote its letter of March 5, 1952, it was no longer the *"current employer"* of these two employees. The prior discharge had terminated such status.

The commission found that the employer's letter of March 5, 1952, did not constitute an unconditional offer of work pursuant to sec. 108.04 (8) (a), Stats., but was merely an invitation to the employees to apply for work, with the company reserving the option to accept or reject such application. While we believe this to be a reasonable inference to be drawn from the wording of the letter, we also hold that Jones and Dickinson had *"good cause"* within the meaning of such subsection to reject the offered work. In the first place the plant of the employer was being picketed by pickets stationed there by the union. Secondly, we consider that these two employees, who had been wrongfully discharged, would have good cause for refusing any offer of

re-employment by the same employer which did not restore them to their prior seniority. The following two sentences of the employer's letter made it clear that their rights to seniority were made conditional on some future unilateral action of the employer:

"You should know, that unfortunately, this union action forces us to consider everyone who is rehired to be a new employee. However, we may be able to restore seniority if later on there is orderly collective bargaining, with a union which will act in a responsible way."

In *Homer Laughlin China Co. v. Hix* (1946), 128 W. Va. 613, 37 S. E. (2d) 649, the employees of the company went out on strike on August 2, 1943, in violation of their collective-bargaining agreement as a result of a controversy with the company over a promotion. The employees on August 6, 1943, voted to return to work, but on the following day the company refused to take them back unless the employees should apply for and return to their positions as new employees. The section of the West Virginia Unemployment Compensation Act, which provided disqualification for benefits during the period of a stoppage of work because of a labor dispute, also provided that such disqualification should not be imposed "if the employees are required to accept wages, hours, or conditions of employment less favorable than those prevailing for similar work in the locality." In discussing the effect of the company's refusal to take back its employees except on the basis of considering them new employees, the West Virginia court stated (128 W. Va. 626, 37 S. E. (2d) 656):

"After the local, in the mistaken belief that all the striking employees of the company would be taken back without any change in their former working conditions, had voted on August 6, 1943, that the men would return to work, and after its members who were employees of other employers had returned to regular work in the same locality, without

any change in their former conditions of employment, the petitioner on August 7, 1943, refused to take back its employees, including the respondent, unless they should apply for and return to their positions as new employees. *This condition, if accepted by the employees, would, of necessity, have deprived them of their rights of seniority, which are often more valuable to, and are more highly prized and cherished by, the workmen, than almost any other incident of their employment.*

"By imposing that restriction, on August 7, 1943, as requisite to the return of the men to the positions they held before the strike, the petitioner required its employees, including the respondent, if he were taken back at all, to accept conditions of employment less favorable than those prevailing for similar work in the locality, within the terms of the statute. This action upon its part operated to prevent any disqualification of the respondent for unemployment benefits. . . ." (Emphasis supplied.)

For the reasons hereinbefore stated, the commission's decision that these two employees are not ineligible for benefits except for week No. 9 of 1952 must be sustained which requires affirmance of the judgments below.

*By the Court.*—Judgments affirmed.

STEINLE, J., took no part.

The following opinon was filed June 1, 1955:

CURRIE, J. (*on motion for rehearing*). The brief submitted in behalf of the appellant employer in support of its motion for rehearing takes exception to the following sentence appearing in this court's original opinion (ante, p. 403):

"Sec. 108.04 (5), Stats., bars an employee from benefits who has been discharged for misconduct, but the employer does not contend that these two employees were guilty of any act of misconduct justifying their discharge, nor would the evidence sustain such a finding."

In making such statement we intended to refer only to conduct on the part of the employees Jones and Dickinson which occurred prior to the mailing and receipt of the employer's letter of February 29, 1952, which the Industrial Commission specifically found effectuated the discharge. The employer contended in its original brief, and repeats such contention in the brief now before us, that these two employees were guilty of acts of misconduct which were performed subsequent to February 29, 1952, which justified the employer in discharging them. As to Jones, such conduct consisted of her taking part in the picketing on March 4, 1952, while the charge against Dickinson is that he did not return to work on March 18, 1952, or thereafter, because he did not wish to cross the picket line.

We fail to see how conduct of an employee occurring after his discharge can constitute the basis for the discharge. Under the provisions of sec. 108.04 (5), Stats., subsequent conduct by an individual who has been discharged, even if in retaliation for such discharge, would appear to be immaterial on the issue of his eligibility for unemployment compensation payments.

*By the Court.*—The motion for rehearing is denied without costs.