HEMSTOCK CONCRETE PRODUCTS, INC.,
Plaintiff-Respondent,

v.

LABOR & INDUSTRY REVIEW COMMISSION,
Defendant-Appellant,

DEPARTMENT OF INDUSTRY, LABOR &
HUMAN RELATIONS, Bernard L. Poellinger,
Kenneth O. Erdman, David J. Follendorf, Terry M.
Haeger, Steven H. Keeney, David G. Lambert,
Harlan P. Millard, Scott T. Miller, Edward L.
Odemoe, Raymond J. Parmenter, Bruce A. Raymer
and Wayne E. Wilber, Defendants.

Court of Appeals

*No. 85-0274. Submitted on briefs October 9, 1985.—Decided
November 25, 1985.*
(Also reported in 380 N.W.2d 387.)

For the defendant-appellant the cause was submitted on the briefs of *Floyd F. Tefft* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *James K. Pease, Jr.,* and *Melli, Walker, Pease & Ruhly, S.C.* of Madison.

Before Gartzke, P.J., Dykman and Eich, JJ.

EICH, J. The Labor and Industry Review Commission appeals from a judgment reversing its decision to grant unemployment compensation to certain employees of Hemstock Concrete Products, Inc. The issue is whether the employees who struck the company while on layoff status lost their employment "because of a strike" within the meaning of sec. 108.04(10), Stats. (1981–82),[1] and thus were ineligible to receive the benefits. Because the employees were laid off with the expectation of definite and predictable recall, the employment relationship continued, and the commission's determination to the contrary was properly reversed by the trial court.[2] We therefore affirm.

Section 108.04(10), Stats., provides that "[a]n employee who has left (or partially or totally lost) his employment . . . because of a strike . . . shall not be eligible for benefits from such . . . employer's account for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed." If the employer-employee relationship has been terminated prior to the strike, it cannot be said

---

[1] Statutory references are to 1981–82, Stats., unless otherwise indicated.

[2] Section 108.04(9), Stats., provides that benefits will not be denied for refusing to accept "new work" where the positions offered are vacant directly due to a strike. Because we hold that the employees were not indefinitely laid off and are thus subject to sec. 108.04(10), the narrow exception carved by sec. 108.04(9) does not apply.

that the strikers "lost [their] employment . . . because of a strike"; and the supreme court has held that an indefinite layoff effectively severs the employment relationship. *A. O. Smith Corp. v. ILHR Department,* 88 Wis.2d 262, 266–68, 276 N.W.2d 279, 281–82 (1979).

In this case, the commission determined that the seasonal layoff was indefinite and therefore no employment relationship existed between Hemstock and its employees when the strike began. The trial court disagreed, concluding that there was an ongoing employment relationship. On appeal, our task is to determine whether the commission's decision is correct, and we owe no deference to the trial court. *Stafford Trucking, Inc. v. ILHR Dept.,* 102 Wis.2d 256, 260, 306 N.W.2d 79, 82 (Ct. App. 1981).

The dispositive issue is whether the employees were indefinitely laid off. This is a mixed question of fact and law to which we apply a mixed standard of review. We accept the commission's findings of fact if they are supported by credible and substantial evidence. Sec. 102.23(6), Stats. Whether those facts meet the legal standard, however—whether they constitute loss of employment because of a labor dispute within the meaning of the statute—is a question of law. *Marathon Electric Mfg. Corp. v. Industrial Comm.,* 269 Wis. 394, 404, 69 N.W.2d 573, 579 (1955). We review such determinations *ab initio,* although we do defer to a certain extent to the construction and application of a statute by the enforcing agency. We will not reverse the agency's determination where its interpretation is one among several reasonable interpretations that can be made, equally consistent with the purpose or policy underlying the statute. *De Leeuw v. ILHR Dept.,* 71 Wis.2d 446, 449, 238 N.W.2d 706, 709 (1976). The purpose of sec. 108.04(10), Stats., is to:

> [protect] employers against having to finance a strike against themselves, as would be the case if their accounts were liable for the payment of unemployment

compensation benefits to their employees while absent from work during the course of the dispute. The employer receives the full benefit of the protection of this subsection during the progress of the labor dispute so long as it does not take affirmative action to end the employee status of the employee. If it does elect to terminate such status during the progress of the labor dispute the reason for the affording of such protection disappears. In other words, it seems to us that one of the purposes of sec. 108.04(10) is to preserve the *status quo* during the course of the labor dispute so that at its cessation the parties thereto stand in the same relation to each other as at its beginning in so far as payment of benefits under the act are concerned. *Marathon,* at 408, 69 N.W.2d at 581.

The facts are undisputed. Hemstock manufactures concrete blocks and prestressed concrete products at its facilities in La Crosse and Sparta. Sales decline sharply each winter when its principal customers are unable to work because of inclement weather. As a result, each winter Hemstock lays off most of its production and delivery workers for two or three months. The layoff procedures, which are specified in collective bargaining agreements with the employee's unions, give all employees the right to continue their health insurance and other fringe benefits during the winter layoff. Except for 1980, when Hemstock permanently eliminated its second shift, it has recalled all of its employees each spring to perform the same jobs, at the same salary, as before the winter layoff.

In 1982, winter layoffs began as usual.[3] The collective bargaining agreements had expired, but Hemstock implemented layoffs in accordance with the terms of the agreements and practices it had followed over the years. Dur-

---

[3] Hemstock gave the employees no specific recall date at that time because recall is dictated by the weather. Previous starting dates at La Crosse have fluctuated from mid-March through May 1 and at Sparta from mid-March through May 2.

ing negotiations for a successor agreement in December, 1982, Hemstock told the employees that the winter layoff was expected to extend from January 3 to March 18, 1983. In February, Hemstock's general manager told the union steward that production would resume on March 14, and that a few employees would be recalled a few days ahead of time for preliminary work. On March 4 and 5, 1983, the company directed a small group of employees to report on the 7th to begin preparations for the resumption of production.[4] On March 7, the union went on strike, without advance notice to Hemstock. Hemstock then sent recall notices to all employees, requesting them to return to their regular jobs immediately. Neither the employees nor the unions responded, and Hemstock began hiring replacements.

The commission argues that even though Hemstock's employees may have had a "definite expectation of being recalled in the spring" at a date that was "generally predictable," the layoff was indefinite because recall dates had varied in past years, and, in 1983, no precise recall date was established until after the strike had begun. This interpretation does not comport with previous supreme court and commission decisions, however, and we deem it unreasonable in light of those decisions and the intent and purpose of sec. 108.04(10), Stats.

A specific recall date is not necessary to reestablish an employment relationship if that relationship was never severed in the first instance. There is a presumption that a layoff severs the employment relationship, but both the commission and the court have recognized that the presumption may be rebutted by "evidence that at the time of layoff there existed an assurance, expressed or clearly implied by circumstances, that work and wages

---

[4] None of the employees involved in this action were recalled on March 4 or 5.

would be resumed at an ascertainable time in the not too distant future." *Hermann v. Miller Brewing Company*, Hearing No. 18852, Decision No. 54–A–38 (Industrial Commission of Wisconsin, Dec. 18, 1953), quoted with approval in *A.O. Smith*, 88 Wis.2d at 267, 276 N.W.2d at 282.[5]

The distinction between indefinite and temporary layoffs was recognized in *A. O. Smith*. There, the court commented on the facts of a Michigan case[6] —where the employees understood that they would be recalled as soon as materials necessary for the resumption of production became available—stating that under such circumstances, "under Wisconsin law it would be clear that the . . . workers were not in an indefinite-layoff status." *Id.* at 269, 276 N.W.2d at 283.[7]

---

[5] In *A. O. Smith*, the workers were concededly on indefinite layoff. The sole issue was whether those employees could continue receiving benefits while striking. The supreme court relied on *Allen-Bradley Co. v. ILHR Department*, 58 Wis.2d 1, 205 N.W.2d 129 (1973), in determining that indefinitely laid-off workers have no employment relationship with the recalling company. In *Allen-Bradley*, it appears that the parties conceded an indefinite layoff where the laid off employee registered for other work at a public employment office and left town, unaware that she might be recalled. The court noted that "years might elapse before an indefinitely laid-off employee was recalled to work." *Id.* at 6, 205 N.W.2d at 131. In neither *Allen-Bradley* nor *A. O. Smith* did the court specifically define what facts would constitute an indefinite versus a temporary layoff. Nonetheless, there is language in both cases supporting our determination that an ongoing employment relationship existed in this case.

[6] *Clapp v. Appeal Board of the Michigan Unemp. Co. Com'n*, 38 N.W.2d 325 (Mich. 1949).

[7] The commission frequently has recognized that a layoff may be temporary even where, at its commencement, it does not have an exact, or even an ascertainable, duration. The layoff need only be short enough, and the recall definite enough, to justify a conclusion that the employment relationship continues. *Cudnohowski v. American Motors Corporation*, Hearing No. 41239(C), Decision No. 62–A–787 (Industrial Commission of Wisconsin, March 9, 1962); *Rogers v. Nash-Kelvinator Corporation*, Hearing No. 18144, Decision No. 53–A–1106, (Industrial

The situation here is similar to that in the Michigan case. Hemstock's employees understood the layoffs to be temporary and that they would receive recall notices as soon as the spring weather permitted. They had a definite expectation of being recalled within the foreseeable future. A winter layoff, with 100 percent employee recall in late March or April, was the company's routine practice over the years. The duration of the layoff was ascertainable; it had a definite ending point—the onset of weather that would permit outdoor work—even though the employees did not know the precise 1983 recall date until at or about the time the strike was called. Moreover, the fact that Hemstock regularly called all employees back to the same jobs at the same wages and that employee benefits could continue during the off season is evidence that there was an ongoing employer-employee relationship. The employees were on temporary layoff, and it is immaterial that they went on strike before actually receiving their recall notices.

The conclusion that the employer-employee relationship continued to exist is not only consistent with the underlying purpose of sec. 108.04(10), Stats., it is the only reasonable conclusion under the law as interpreted by the courts and the commission itself.

*By the Court.*—Judgment affirmed.

---

Commission of Wisconsin, August 28, 1953). In *Cudnohowski* and *Rogers,* the layoffs were normal in the employer's businesses, and although the exact length of the layoffs was unknown when they began, their duration could be predicted with reasonable accuracy. In both cases, the commission concluded that the employment relationship continued during the layoffs.