Steven J. TRINWITH, et al., Plaintiffs-Appellants,†

v.

## LABOR & INDUSTRY REVIEW COMMISSION, and Patrick Cudahy, Inc., Defendants-Respondents.

Court of Appeals

*No. 88-1221. Oral argument November 1, 1988.—Decided March 21, 1989.*

(Also reported in 439 N.W.2d 581.)

† Petition to review denied.

For the plaintiffs-appellants the cause was submitted on the briefs of *Habush, Habush & Davis, S.C.,* with *Kenneth R. Loebel,* of Milwaukee.

For the defendant-respondent Labor & Industry Review Commission the cause was submitted on the briefs of *Glenn E. Kelley,* of Madison.

For the defendant-respondent Patrick Cudahy, Inc., the cause was submitted on the briefs of *Krukowski & Costello, S.C.,* with *David F. Loeffler,* of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

SULLIVAN, J. Steven J. Trinwith (Trinwith) appeals from a judgment that denied him, and about 320 other individuals similarly situated, unemployment compensation (UC).[1] The judgment affirmed a decision of the Labor and Industry Review Commission (LIRC) denying Trinwith UC benefits. Trinwith advances two arguments: (1) that his employer, Patrick Cudahy, Inc. (Cudahy) locked him out of the establishment, and alternatively (2) that Cudahy's hiring of replacement workers at the reduced wage scale altered his employment relationship sufficiently to create UC eligibility.[2]

[1]For purposes of this discussion, Trinwith and his co-claimants will be collectively referred to as Trinwith.

[2]Section 108.04(10), Stats., was amended, and subs. (c) was created by secs. 1 and 2 of 1983 Wis. Act 468, eff. June 3, 1984. The sections, prior to the secs. 45 and 48, 1987 Wis. Act 38 revisions, provided that:

> LABOR DISPUTE. (a) An employe who has left or partially or totally lost employment with an employing unit because of a strike or other bona fide labor dispute, *other than a lockout,* is not eligible for benefits from the account of the employer whose employment the employe left or lost or any previous employer's account for any week in which the strike or other bona fide labor dispute is in active

636

We affirm because LIRC correctly determined that Trinwith struck Cudahy and because Wisconsin Supreme Court precedent bars recovery on the replacement employees-altered relationship theory.

Trinwith filed a claim for UC. A LIRC deputy issued a determination barring Trinwith's eligibility for benefits. *See* sec. 108.09(2)(b), Stats. Trinwith requested a sec. 108.09(2r), Stats., hearing before a hearing tribunal. An administrative law judge found that Trinwith left his employment because of a strike or other bona fide labor dispute and entered a decision determining his ineligibility for UC. *See* sec. 108.09(3)(b), Stats. Trinwith timely petitioned LIRC for review of the appeal tribunal's decision. *See* sec. 108.09(6)(a), Stats. After a hearing, LIRC issued findings and a

progress in the establishment in which the employe is or was employed. [Emphasis added.]

. . .

(c) In this subsection, "lockout" means the barring of one or more employes from their employment in an establishment by an employer as a part of a labor dispute, which is not directly subsequent to a strike or other job action of a labor union or group of employes of the employer, or which continues or occurs after the termination of a strike or other job action of a labor union or group of employes of the employer.

Sec. 108.04(10)(a) and (c) (1985–86). *See* sec. 108.04(10)(d) (1987–88), which now contains the lockout provision.

Prior to its 1983 amendment, subs. (10) provided:

LABOR DISPUTE. An employe who has left (or partially or totally lost) his employment with an employing unit because of a strike or other bona fide labor dispute shall not be eligible for benefits from such (or any previous) employer's account for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed.

Sec. 108.04(10) (1981–82).

637

decision denying UC for the same reasons as the appeal tribunal. Trinwith brought an action for judicial review. *See* secs. 108.09(7) and 102.23, Stats. The circuit court entered a judgment confirming LIRC's denial of UC. *See* sec. 102.23(1)(e), Stats.

LIRC's largely undisputed findings establish that Cudahy employed Trinwith and his co-claimants in maintenance and production work. Cudahy was in the business of slaughtering swine and in the production of fresh and processed meat. Local P–40, United Food and Commercial Workers International Union (Local P–40), represented Trinwith. The most recent contract between Local P–40 and Cudahy extended from October 12, 1982 to September 1, 1985. It was extended by the parties to December 31, 1986, to allow for negotiations for a new contract. Cudahy and union representatives began negotiations in November of 1986. On December 23, 1986, Cudahy made its final offer. Two days later, Cudahy informed Local P–40 that negotiations were at an impasse and that Cudahy would implement the terms of its final offer after January 1, 1987. The offer reduced Trinwith's salary from $9.33 to $7.35 per hour, a reduction of approximately twenty-one percent. Local P–40 and Cudahy met on December 29 and 30, 1986, but to no avail. On December 30, Local P–40 asked Cudahy to extend the contract, but Cudahy refused. The plant was closed on January 1, 1987, due to the New Year's holiday. On January 2, Cudahy resumed production despite a high rate of absenteeism. On January 3, Local P–40 explained Cudahy's final offer to its members. The membership voted 686 to 38 to reject Cudahy's offer.

LIRC further found that on January 4, 1987, Local P–40 set up picket lines at Cudahy's gates. On January 5, production and maintenance workers failed to appear

for their morning shifts. To fill these positions, on January 7, Cudahy management decided to hire replacement employees. On January 9, Cudahy placed a newspaper advertisement to obtain replacement workers. After hiring replacements, the slaughtering and processing resumed gradually. A replacement employee, when hired, signed the following document:

## NOTICE OF RIGHT UNDER THE NATIONAL LABOR RELATIONS ACT

I understand that I am a permanent replacement as defined by the National Labor Relations Act and as interpreted by the Employer with regard to decisions by the National Labor Relations Board and the Courts. The term "permanent replacement" does not imply or mean a guarantee of continued employment regardless of the Employer's needs or desires. I further understand that my continued status as an employee may be contingent on decisions of the National Labor Relations Board, any of its Regional Offices, or the courts or upon agreements reached under the authority of the National Labor Relations Act with the National Labor Relations Board, any of its Regional Offices, or the Courts.

_____ _____
Employee Date

_____
Clock #

By a letter of January 8, Cudahy informed Local P–40 members of the status of permanent replacement employees. The letter stated in part:

When a company hires permanent replacements in an economic strike, each striker retains his/her right to reinstatement, but only as openings occur. That is, if you offer to return to work after permanent

replacements have been hired in your place, we would not have to recall you to work immediately. You would then be placed on a preferential recall list for a limited period. Thereafter, as openings occur, and if you are qualified, with seniority, we would recall you back. We would not be allowed by law to displace the permanent replacement workers to make room for you to return.

The facts as conceded by the parties and found by LIRC are binding upon this court. The application of a statute to an undisputed set of facts is a question of law. *Ball v. District No. 4, Area Bd.,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984). LIRC's application of sec. 108.4(10)(a) and (c), Stats. (1985–86), to these undisputed facts is not binding upon us. *See Nottleson v. DILHR,* 94 Wis. 2d 106, 115–16, 287 N.W.2d 763, 768 (1980). For purposes of this opinion, we will be referring to the 1985–86 version of the lockout provision. However, sec. 108.04(10)(d), Stats., now contains the lockout provision. As to legal conclusions, we sustain the LIRC's decision if supported by a rational legal basis and if its decision comports with the law including statutes, court decisions and constitutional provisions. *Wehr Steel Co. v. DILHR,* 102 Wis. 2d 480, 487 307 N.W.2d 302, 306 (Ct. App. 1981), *aff'd and modified,* 106 Wis. 2d 111, 315 N.W.2d 357 (1982).

Ordinarily, when the legislature charges an administrative agency to apply and enforce a particular statute, we accord "great weight" to the agency's construction and interpretation of the statute, and we will not set it aside unless clearly contrary to legislative intent. *A. O. Smith Corp. v. DILHR,* 88 Wis. 2d 262, 267, 276 N.W.2d 279, 282 (1979). However, in a case like this, where the question involved is one of first impression, and the commission's interpretation does not

reflect an unchallenged position, we accord the agency's interpretation "due weight." *School Dist. of Drummond v. WERC,* 121 Wis. 2d 126, 133, 358 N.W.2d 285, 289 (1984). This court accords no deference to the decision of the circuit court in deciding the issues. *Schachtner v. DILHR,* 144 Wis. 2d 1, 4, 422 N.W.2d 906, 907–08 (Ct. App. 1988).

Trinwith argues that Cudahy locked him out when it reduced his wages by twenty-one percent and hired replacement workers to fill the positions. He contends that exclusion from work when the existing contract expired, and refusal, upon Local P–40's request, to negotiate further and simultaneously maintain the status quo, was a constructive lockout. *See* sec. 108.04(10)(c), Stats.[3]

Trinwith further asserts that LIRC's narrow interpretation of "lockout" enervates the presumption of eligibility possessed by a benefit claimant. He argues that LIRC's interpretation alleviates the duty on the part of the party contesting payment of benefits to establish disqualification. *See Kansas City Star Co. v. DILHR,* 60 Wis. 2d 591, 602, 211 N.W.2d 488, 493 (1973), *cert. denied,* 419 U.S. 870 (1974). Trinwith concedes that there was a work stoppage on January 4,

---

[3]Trinwith's position is exemplified by *Erie Forge & Steel Corp. v. Unemployment Compensation Bd. of Review,* 163 A.2d 91, 93–94 (Pa. 1960), which states that the test of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout" ....

1987 to protest Cudahy's unilateral twenty-one percent wage reduction. Trinwith relies upon a statement of the Wisconsin Supreme Court in *De Leeuw v. DILHR,* 71 Wis. 2d 446, 452–53, 238 N.W.2d 706, 710–11 (1976), for the proposition that the 1983 amendment of sec. 108.04(10) intended to include Minnesota's approach to the lockout situation. The *De Leeuw* court stated that Minnesota takes a "different approach" to lockouts because its statute secures a public policy of permitting UC eligibility for those who become unemployed "through no choice or fault of their own." *Id.* at 452–53, 238 N.W.2d at 710–11.

The central question is whether Trinwith engaged in a strike or other labor dispute or whether Cudahy locked him out. As noted, subs. (10)(c) specifically defines "lockout." Legislative definition of a word compels our acceptance of the term as defined, and we may not look elsewhere for a definition. *See Sullivan Bros., Inc. v. State Bank of Union Grove,* 107 Wis. 2d 641, 646, 321 N.W.2d 545, 547 (Ct. App. 1982). If a statute is plain and unambiguous, we must apply its plain meaning. *See Meunier v. Ogurek,* 140 Wis. 2d 782, 766–87, 412 N.W.2d 155, 157 (Ct. App. 1987). A statute is ambiguous if reasonable, well-informed persons could disagree as to its meaning. *Standard Theatres, Inc. v. State,* 118 Wis. 2d 730, 740, 349 N.W.2d 661, 667 (1984). If a statute contains no ambiguity, we are not free to consult extrinsic sources to ascertain its meaning. *Tahtinen v. MSI Ins. Co.,* 122 Wis. 2d 158, 166, 361 N.W.2d 673, 677 (1985).

We agree with LIRC that sec. 108.04(10)(c), Stats., is unambiguous and that legislative intent can be gleaned from its terms.

We start with the wording of the statute itself. *Aparacor, Inc. v. DILHR,* 97 Wis. 2d 399, 402, 293 N.W.2d 545, 547 (1980). Subsection (10)(a) excludes from eligibility any employee, except those in a lockout, who lost employment because of a strike or bona fide labor dispute. Subsection (c) defines lockout as "the barring of one or more employes from their employment in an establishment by an employer as a part of a labor dispute ...." Sec. 108.04(10)(c), Stats. The term "barring" is not statutorily defined. "Absent such a legislative definition, the ordinary and accepted meaning of a word used by the legislature can be established by a reference to a recognized dictionary." *Goodger v. City of Delavan,* 134 Wis. 2d 348, 352, 369 N.W.2d 778, 780 (Ct. App. 1986). Webster's Dictionary defines "barring" as "1. to fasten with or as with a bar 2. to obstruct by means of a bar or bars; shut off; close 3. to oppose, prevent, or forbid, as by legal action 4. to keep out; exclude ...." Webster's New World Dictionary 111 (2d ed. 1979). We conclude that the legislature clearly intended that an employer lock an employee out of the establishment as a result of a dispute.

Trinwith argues that Cudahy's refusal to extend the wage rate of the expired contract during negotiations was a bar to employment in the establishment. He relies extensively on two cases that indicate that a company's failure to bargain at the expiration of a contract may constitute a constructive lockout. He also asserts that the Wisconsin legislature intended to incorporate this concept into its 1983 amendment to subs. (10) and creation of subs. (c).

In *Sunstar Foods Inc. v. Uhlendorf,* 310 N.W.2d 80 (Minn. 1981), the Minnesota Supreme Court upheld an agency's finding of fact, based on substantial evidence, that Sunstar had locked out its employees. *Id.*

at 84–85. Hence, the employees were entitled to UC. The agency's finding was made under Minn. Stats. Ann. sec. 179.01, subd. 9 (West 1980), which defined a lockout as "the refusal of the employer to furnish work to employees as a result of a labor dispute." This definition gave the agency leeway to probe whether the lockout was caused by the employer. Subsection (10)(c), however, defines lockout as a "barring" from employment without reference to cause.

In *Erie Forge,* the Pennsylvania Supreme Court upheld the referee and the agency's fact-findings that the employer locked out the claimants-employees under Pa. Stat. Ann. tit. 43, sec. 802(d) (Purdon 1960), which provided UC "due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory . . . ." The *Erie* court determined that the agency decides, as a fact issue, the final cause of and responsibility for the work stoppage. *Erie Forge,* 163 A.2d at 94. In contrast, subs. (10)(c) does not require inquiry into the cause of the strike or stoppage, it only requires inquiry into whether a "barring" from employment occurred.

In *Sunstar* and *Erie,* the two courts upheld agency fact findings under statutes that required the agency to determine, for purposes of lockout, who ultimately caused a work stoppage. Subsection (10)(c) does not require such an inquiry. Therefore, since Cudahy did not bar the employee's entrance into their place of employment, we conclude that there was no lockout under sec. 108.04(10)(c), Stats.

Alternatively, Trinwith contends that, in the event no lockout occurred, Cudahy's conduct, particularly its unilateral reduction of wages, modified his employment status sufficiently to qualify him as eligible for UC. He

asks us to limit the holding of *Rice Lake Creamery Co. v. Industrial Comm'n,* 15 Wis. 2d 177, 112 N.W.2d 202 (1961), to its facts.[4] He contends that Cudahy's January 8, 1987 announcement to Local P-40 members—that replacements would be permanent—constituted a discharge.

An issue of law is presented as to whether Cudahy's act constituted a discharge. *See Carley Ford, Lincoln, Mercury, Inc. v. Bosquette,* 72 Wis. 2d 569, 577-78, 241 N.W.2d 596, 601 (1976).

*Rice Lake* controls this issue. In that case, the supreme court held that loss of employee status, not loss of employment, determined eligibility for UC benefits. *See Rice Lake,* 15 Wis. 2d at 185-86, 112 N.W.2d at 206. The question is whether the January 8th communication was a discharge. Trinwith insists that the wage reduction so altered his employment relationship that it vitiated any previous ineligibility for UC. However, *Rice Lake* addressed not a modification in the relationship, but the employer's act of discharge. The court said "[o]rdinarily a discharge of an employee is an unequivocal unilateral act of the employer, leaving no shred of doubt of his intention." *Id.* at 187, 112 N.W.2d at 207.

The January 8 communication was not a discharge, but rather, to the contrary, recited that each employee retained his or her right to reinstatement. Nor did Trinwith consider himself discharged:

Q [Cudahy attorney] Did you hear the testimony today about jobs available at Patrick Cudahy?

[4] The court of appeals is required to enforce decisions and apply opinions of the supreme court. *See State ex rel. Eckmann v. DHSS,* 114 Wis. 2d 35, 41, 337 N.W.2d 840, 843 (Ct. App. 1983).

A [Trinwith] Did I hear that today, yes. Are you going to pay me $9.33 an hour? I'll be happy to come back.

We conclude that LIRC correctly determined that Cudahy did not discharge Trinwith by replacing him and his co-claimants with replacement employees at a reduced wage scale. See *Carley Ford,* 72 Wis. 2d at 579, 241 N.W.2d at 600–01 (1976), which affirmed a DILHR finding of discharge.

In summary, we determine, as a matter of law, that LIRC's decision and order denying Trinwith and his co-claimants UC must be affirmed because:

> (1) they were engaged in a strike or bona fide labor dispute within the terms of sec. 108.04(10)(a), Stats., and were not locked out within subs. (c); and
> (2) they were not discharged and their positions were not terminated.

*By the Court.*—Judgment affirmed.

FINE, J. (concurring). I join in the majority decision and its analysis. I also agree with the dissent that the actions of the Patrick Cudahy management on December 25, 1986 were not in the Christmas spirit. That, however, is not the issue before this court. The issue before this court is whether Trinwith and his coworkers were kept from working because of a "lockout." The legislature has defined "lockout" to mean "the barring of one or more employes from their employment in an establishment as part of a labor dispute . . . ." Sec. 108.04(10)(d), Stats. The reduction of wages, as odious as it was to Trinwith and his coworkers, was not a "barring."

As the majority decision notes, the Minnesota case upon which the dissent relies interpreted a statute that

defines "lockout" differently than does the Wisconsin statute. Majority opinion at 643–44. The Minnesota statute defines "lockout" as "the refusal of the employer to furnish work to employees as a result of a labor dispute." Minn. Stat. sec. 179.01, subd. 9 (1980). The Supreme Court of Minnesota held that under this definition a "unilateral imposition by an employer of employment terms so unreasonable that the employees have no alternative but to leave constitutes a lockout." *Sunstar Foods, Inc. v. Uhlendorf,* 310 N.W.2d 80, 83 (Minn. 1981). The Minnesota Supreme Court recognized that whether there was a lockout was "a question of fact" to be decided by the Commissioner of the Department of Economic Security from all of the facts of record. *Id.* at 83. The Commissioner's finding would be upheld if it was "supported by substantial evidence" in the record, and it was not "affected by an error of law" or "arbitrary and capricious." *Id.* at 84. Applying that standard of review, the Minnesota Supreme Court held that the Commissioner "could have determined on this record that wage cuts of 21–26 percent unilaterally imposed by the employer were such an unreasonable condition of employment that the employees had no alternative but to leave...." *Id.* at 85.

Unemployment compensation is a creation of the legislature and not the courts. The Wisconsin legislature has determined the prerequisites to receipt of unemployment compensation in this state. The dissent would have the Wisconsin statute mean the same as Minnesota's differently worded statute has been interpreted by the Minnesota Supreme Court. In effect, the dissent would rewrite the Wisconsin statute to provide unemployment compensation where a wage reduction is "harsh and unreasonable," dissent at pages 651–54, regardless of whether it is economically justified (an

647

issue the dissent does not address). The legislature, however, has established a different standard, which we must obey.

Courts do the law a significant injustice when they assume the legislative prerogative. As Justice Benjamin Nathan Cardozo, then Chief Judge of New York, warned almost sixty years ago:

> A community whose judges would be willing to give it whatever law might gratify the impulse of the moment would find in the end that it had paid too high a price for relieving itself of the bother of awaiting a session of the Legislature and the enactment of a statute in accordance with established forms.

*Doyle v. Hofstader,* 177 N.E. 489, 498 (N.Y. 1931).

The issue of whether the wage rate reduction was an unfair labor practice is currently pending before the National Labor Relations Board. If the NLRB determines that Patrick Cudahy is guilty of an unfair labor practice, it is empowered to fashion an appropriate remedy. The reduction of wages, however, is not a "barring" and, accordingly, by statute, is not a "lockout." *See* Sec. 108.04(10)(d), Stats.

MOSER, P.J. (*dissenting*). I conclude that the twenty-one percent wage reduction instituted by Patrick Cudahy was a harsh and unreasonable action which effectuated a lockout of its employees pursuant to sec. 108.04(10), Stats. Furthermore, I conclude that the LIRC exhibited extreme management bias in determining that the Patrick Cudahy employees were not locked out. Therefore, I would reverse the judgment of the trial court affirming the LIRC decision. I would

hold that the employees be allowed to claim U.C. benefits.

The pertinent statute sections provide as follows:

**108.04(10)** Labor Dispute. (a) An employe who has left or partially or totally lost his or her work with an employing unit because of a strike or other bona fide labor dispute, other than a lockout, is not eligible to receive benefits based on wages paid for employment prior to commencement of the dispute for any week in which the dispute is in active progress in the establishment in which the employe is or was employed, ....

. . . .

(d) In this subsection, "lockout" means the barring of one or more employes from their employment in an establishment by an employer as a part of a labor dispute, which is not directly subsequent to a strike or other job action of a labor union or group of employes of the employer, or which continues or occurs after the termination of a strike or other job action of a labor union or group of employes of the employer.

Reviewing courts will accept an agency's factual findings if they are supported by credible and substantial evidence, but whether certain facts taken together constitute either a loss of employment because of a bona fide labor dispute or a lockout is a question of law.[1] Generally, reviewing courts defer to agency decisions that are significantly within the expertise of a particular agency.[2] Furthermore, due weight is given agency decisions when the legal conclusion(s) reached

[1]*Hemstock Concrete Prods., Inc. v. LIRC,* 127 Wis. 2d 437, 439, 380 N.W.2d 387, 389 (Ct. App. 1985).

[2]*Esparza v. DILHR,* 132 Wis. 2d 402, 405, 393 N.W.2d 98, 100 (Ct. App. 1986).

are of first impression or involve statutory interpretation.[3] However, there must be a rational basis to support the agency's conclusion(s),[4] and the agency's interpretation of the statute as applied to the facts must be reasonable.[5]

Wisconsin case law is not on point as to whether a twenty-one percent wage decrease, coupled with the circumstances in the case at hand, constitutes a lockout under sec. 108.04(10), Stats. Subsection (10)(d) requires that the wage decrease (1) bar employees (2) as a result of a labor dispute which (3) is not subsequent to a strike or other action of a labor union or group of employees. However, we may look to the law of our sister state, Minnesota, for interpretive guidance.

Minnesota's unemployment compensation law closely resembles that of Wisconsin. In Minnesota, employees are disqualified from U.C. benefits if they have engaged in a strike that is a bona fide labor dispute.[6] The Minnesota statutes define "labor dispute" as

> any controversy concerning employment, tenure or conditions or terms of employment or concerning the association or right of representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms, tenure, or other conditions of employment, regardless of whether or not the relationship of employer and employee exists as to the disputants.[7]

---

[3]*School Dist. of Drummond v. WERC,* 121 Wis. 2d 126, 133, 358 N.W.2d 285, 289 (1984).

[4]*Id.* at 135, 358 N.W.2d at 290.

[5]*Esparza,* 132 Wis. 2d at 408, 393 N.W.2d at 101.

[6]Minn. Stat. Ann. sec. 268.09 subd. 3(a) (West 1989).

[7]*Id.* sec. 179.01 subd. 7 (West 1989).

However, nothing in the above statute is deemed to deny U.C. benefits to any employee "who becomes unemployed because of a lockout."[8] A "lockout" is defined as the refusal of an employer to furnish work to employees as a result of a labor dispute.[9] *Sunstar Foods, Inc. v. Uhlendorf*[10] provides further insight as to the meaning of "lockout" under Minnesota law.

In *Sunstar,* the Minnesota Supreme Court determined that a unilateral wage reduction of twenty-one to twenty-six percent constituted a "lockout." That court upheld the reviewing agency's decision that the wage reduction was "such an unreasonable condition of employment that the employees had no alternative but to leave."[11] The court thus found that a decrease in wages between twenty-one and twenty-six percent is good cause for employment separation and entitles workers to U.C. benefits.[12]

I conclude that the LIRC's decision to deny Trinwith's claim for U.C. benefits was neither rational nor reasonable. The unilateral twenty-one percent wage reduction was harsh and unreasonable. This "take it or leave" proposal left Patrick Cudahy employees with no alternative but to leave their jobs. Thus, I would hold that there was a lockout under sec. 108.04(10), Stats., and that Trinwith and his fellow workers are entitled to U.C. benefits.

While the above would be dispositive of this appeal, I am compelled to add that the LIRC exhibited extreme management bias in determining that Patrick Cudahy employees were not locked out. The LIRC exhibited its bias by: (1) not considering certain rele-

---

[8]*Id.* sec. 268.09 subd. 3(c)(2).
[9]*Id.* sec. 179.01 subd. 9.
[10]310 N.W.2d 80 (Minn. 1981).
[11]*Id.* at 85.
[12]*Id.* at 84–85.

vant and uncontroverted facts brought before it; (2) not considering the social implications of the notice issued by Patrick Cudahy on December 25, 1986; (3) ignoring evidence of certain bad faith negotiations; and (4) ignoring tax benefits Patrick Cudahy received as a result of implementing its final offer of December 23.

Agency examiners, such as the LIRC appeal tribunal, must remain neutral in deciding cases brought before them.[13] Furthermore, while they are not bound by common law or statutory rules of evidence, they are required to admit all evidence having reasonably probative value.[14] Also, agency examiners must provide a showing of discretion for their decisions, which illustrates more than a choice between alternatives, and that a particular ruling is derived from facts, or inferences from facts, in the record.[15] Thus, agency rulings must be based upon a logical rationale supported by proper legal standards.[16]

The LIRC exhibited management bias by failing to consider the following probative information: (1) Trinwith and his fellow workers already gave Patrick Cudahy wage concessions in 1982 and in 1984; (2) for sixteen months prior to January 1, 1987, Patrick Cudahy made a profit of $750,000; (3) in addition to calling for across-the-board wage reductions, the final offer of December 23 allowed Patrick Cudahy to fill unemployment vacancies with part-time employees. This would allow up to twenty percent of the work force to be part-time, and such employees could work up to

[13]*Marathon Elec. Mfg. Corp. v. Industrial Comm'n,* 269 Wis. 394, 405, 69 N.W.2d 573, 579–80 (1955).

[14]Sec. 227.45(1), Stats; *Village of Menomonee Falls v. DNR,* 140 Wis. 2d 579, 609, 412 N.W.2d 505, 518 (Ct. App. 1987).

[15]*Reidinger v. Optometry Examining Bd.,* 81 Wis. 2d 292, 297, 260 N.W.2d 270, 273 (1977).

[16]*Id.*

thirty hours per week, but they would not receive health insurance, retirement benefits or vacation and holiday pay; and (4) the final offer provided that Patrick Cudahy would restudy the work standards of all union jobs. It was an abuse of discretion for the LIRC appeals tribunal to not consider this information.

The tribunal also abused its discretion by ignoring the social import of the December 25 notice. On Christmas Day, 1986, Patrick Cudahy employees were told that the terms of the December 23 final offer would be instated on January 1, 1987. Thus, on January 1, 1987, workers' wages would be reduced by twenty-one percent, part-time employees could be hired and constitute twenty percent of the work force, and job standards would be reevaluated. The timing of this action evidences a calculated, mean-spirited, hard-heartedness that makes Scrooge's conduct towards Bob Cratchitt pale into insignificance. The appeal tribunal's failure to consider this information exhibits almost absolutely uncaring management bias.

Another abuse of discretion occurred when Patrick Cudahy employees requested an adjournment of the LIRC appeals hearing because a National Labor Relations Board (NLRB) administrative law judge (ALJ) tentatively held that Patrick Cudahy had bargained in bad faith. The LIRC appeals tribunal noted that the NLRB ALJ decision was pending before the NLRB appeals board. The LIRC tribunal refused to grant Trinwith's request because: (1) the letters viewed by the NLRB ALJ preexisted the initial LIRC hearings, and were not subpoenaed by Trinwith; thus, the letters were not considered during the earlier hearings; and (2) the letters did not constitute "newly discovered evidence," and thus they could not justifiably be introduced on appeal. I would hold that the LIRC appeals tribunal abused its discretion in rejecting evidence of

the ALJ's decision finding that Patrick Cudahy had bargained in bad faith. That information was probative and should have been considered.

Finally, it is uncontroverted that when Patrick Cudahy hired the replacement workers,[17] it applied for federal tax credit under the targeted jobs tax program created by the Federal Tax Reform Act of 1986. The record reflects that the president of Patrick Cudahy testified that approximately five hundred replacement employees were involved in the tax credit attempt, and that the program could have provided Patrick Cudahy with a $1,200,000 exemption because of these new employees. This potential bottom-line profit was relevant to show Patrick Cudahy's incentive to replace union employees with the five hundred replacement workers. The LIRC tribunal abused its discretion by failing to consider this relative information.

I would therefore reject LIRC's pious postulation that its decision was neutral, and hold that all of the above examples illustrate its obvious management bias, and that this bias unequivocally infected its decision-making process. I would hold as a matter of law that the LIRC acted unreasonably, and I would also hold as a matter of law that instituting the terms of the December 23 final offer was so harsh and unreasonable that it constituted a "lockout" as defined in sec. 108.04(10)(d), Stats. Therefore, Trinwith and his coworkers were not involved in a strike resulting from a bona fide labor dispute under sec. 108.04(10)(a). The Patrick Cudahy employees are thus entitled to U.C. benefits.

---

[17]I do not take issue with Wisconsin law regarding the hiring of replacement workers during strikes, particularly *Rice Lake Creamery Co. v. Industrial Comm'n,* 15 Wis. 2d 177, 112 N.W.2d 202 (1961).